Argued February 15; reargued September 19, 1944; affirmed
January 23, 1945

## JOURNAL PUBLISHING CO. *v.* STATE UN-
EMPLOYMENT COMPENSATION
COMMISSION ET AL.

(155 P. (2d) 570)

Before BAILEY, Chief Justice, and BELT, ROSSMAN, KELLY, LUSK, BRAND and HAY, Associate Justices.

*Fletcher Rockwood*, of Portland (Hart, Spencer, McCulloch & Rockwood, of Portland, on the brief), for appellant.

*H. Lawrence Lister*, Assistant Attorney General, for respondent State Unemployment Compensation Commission of the State of Oregon.

*George Black, Jr.*, of Portland (Black, Johnson & Kendall and John W. Kendall, all of Portland, on the brief), amicus curiae.

LUSK, J.

This is an appeal from the decree of the Circuit Court affirming an award of benefits by the State Unemployment Compensation Commission in favor of one James R. Johnston. The question for decision is whether Johnston was an employe, within the meaning of the Unemployment Compensation Law, of the plaintiff, Journal Publishing Company, a corporation, and as such entitled to unemployment compensation.

The following facts appear: The plaintiff publishes a daily and Sunday newspaper in Portland, Oregon, and during the years 1937, 1938 and 1939 Johnston was a carrier and distributor of its papers on rural routes in this state. He operated under written contracts, the first of which was dated July 1, 1937, and

the second, though dated December 1, 1938, was deemed effective by the parties as of July 1, 1938.

The first contract covered a route in Benton County and continued in effect until July 1, 1938, when the route was abandoned by the plaintiff. The second contract was entered into to cover a route in Linn County, and was in effect from July 1, 1938, until March 1, 1939, when the plaintiff cancelled it for what it considered good and sufficient reason.

In broad outline there is no great difference between the provisions of the two contracts. In each Johnston agrees to deliver the papers of the plaintiff to subscribers on the prescribed route, to pay the plaintiff on the tenth of each month a stipulated price for the papers which he orders, and to charge the subscribers the prices fixed by the contract; he agrees to do all in his power to increase the sales of The Journal and not to contract with or sell any other newspapers; he agrees to give thirty days notice of his intention to abandon the route. The foregoing provisions are in substance common to both contracts. In the first contract is a provision authorizing the plaintiff to take over Johnston's territory without notice if he does not pay for the papers as agreed; in the second a provision authorizing the plaintiff to cancel the contract at any time "for good and sufficient reason". By the first contract Johnston agrees to "keep his books in perfect order with the correct lists of the names and addresses of all customers, with dates to which they are paid" and "that all books, lists, etc., are to be turned over by the CIRCULATOR (Johnston) to his successor promptly at such time as he surrenders the territory". By the second contract Johnston acknowledges receipt from the plaintiff "of a list

of subscribers who purchase The Journal and who live on a certain paper route near Corvallis, Oregon, which list of subscribers and paper route is hereby leased to me by The Journal.'' He promises that he will not turn over said list of subscribers to any person nor disclose the name of any subscriber to The Journal without first obtaining the consent of The Journal. The contract recites that Johnston has not paid any money to any person for the list of subscribers, and he agrees that he will not sell it to any person or persons for any money, and that, upon cancellation, he will ''forthwith turn over to The Journal, or its authorized representative, the names of all subscribers to whom I have been delivering The Journal'', and that he will keep a written list of all such persons, with their street addresses, and that such written list shall be the property of The Journal. He further agrees not to collect in advance from any of the subscribers, ''but should any subscriber choose to pay in advance I will remit to The Journal immediately.''

Johnston made delivery of the papers by automobile, and, according to the findings of the commission, was ''granted by the company a regular cash allowance for use of his automobile on the (Benton County) route, which allowance ranged from $47.00 to $75.00 a month'', while on the Linn County route ''the company credited claimant's account with an automobile allowance of $78.00 a month''.

The commission further found the following facts as to the method by which the business was transacted under the contracts:

"The claimant, from the time, ordered from the Company the amount of newspapers he cur-

rently needed, which amount the Company sent him until a change in number was ordered. The Company charged claimant with the agreed wholesale price and the claimant sold the newspapers at retail price to the subscribers on his rural route, delivered the same into the paper boxes along the route, collected from the subscriber the retail price, and paid monthly to the Company on its bill any difference owing the Company between the wholesale bill and the automobile allowance and other credits. During most of the time, by reason of the automobile allowance, a monthly credit was due the claimant which was paid by the Company. During the claimant's base year he also performed incidental services not included in the written agreement for which services only he was paid $6.64 by the Company.

"The Company's district manager had on one or two occasions warned the Circulator or Carrier concerning being late in receiving the newspapers for delivery and had on at least one occasion demanded of the Carrier that he re-deliver a paper to some customer from whose paper box the papers had been taken by unauthorized persons. There is also some evidence to indicate that on one occasion the district manager had objected to claimant's wife taking over the deliveries. The Commission finds in these matters that any established exercise of material direction and control by such district manager did not actually go beyond the insistence that claimant fulfill the obligations of the written terms of his agreements."

The commission found that Johnston performed services for remuneration within the meaning of the Unemployment Compensation Law, that a material direction and control was retained over the performance of such services by the plaintiff through the terms of its contracts, and that Johnston was not customarily or otherwise engaged in an independently established

business of the same nature as that involved in the contract of service. An award of benefits for unemployment was made accordingly.

The plaintiff thereupon commenced this suit to secure judicial review of the decision of the commission, and the circuit court, after a hearing, entered a decree affirming the commission's award. From that decree the plaintiff has appealed.

LUSK, J.

This case has been twice argued. After the original submission counsel for Oregonian Publishing Company, which has a similar case pending here, at the invitation of the court filed a brief as friends of the court and participated in the reargument. The court is indebted to all the counsel engaged for the thoroughness, industry and ability which have marked their presentation of the important question to be decided.

The Unemployment Compensation Law contains its own definition of employment in the following provisions of § 126-702, O. C. L. A.:

"(f) 'Employment' means service for an employer * * * performed for remuneration or under any contract of hire, written or oral, express or implied. * * *

"(E) Services performed by an individual for remuneration shall be deemed to be employment subject to this act unless and until it is shown to the satisfaction of the commission that:

"(1) Such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and

"(2) Such individual customarily is engaged in an independently established business of the same nature as that involved in the contract of service."

■■ We have heretofore held that the test of coverage under the law is whether a case falls within the statutory definitions, which are "broader than the scope of the employer-employee relation or that of master and servant as those terms are known to the common law." *Rahoutis v. Unemployment Compensation Commission*, 171 Or. 93, 113, 136 P. (2d) 426; *Singer Sewing Machine Company v. State Unemployment Compensation Commission*, 167 Or. 142, 149, 164, 176, 103 P. (2d) 708, 116 P. (2d) 744, 138 A. L. R. 1398. The Rahoutis case is also authority for the proposition (which follows from the plain terms of the law) that, once it is shown that the individual has performed services for remuneration for an employer, the burden is cast upon the one who claims that such individual is not under the act to satisfy the commission that he comes within the exceptions provided in § 126-702 (f), (E), O. C. L. A. (171 Or. 119).

These general rules of construction (with some reservation on plaintiff's part as to the latter) are accepted by the parties as controlling, and it has not been contended here, as it was in the cited cases, that, because the individual whose status is in question might have been deemed an independent contractor at common law, he would necessarily, for that reason, be excluded from the class of employes within the meaning of the Unemployment Compensation Law.

The main contention here is that the relationship between Johnston and the plaintiff was not one of service, and in any event not of service for remuneration, but simply that of vendor and vendee. The plaintiff, it is said, sold its papers to Johnston, who resold them to the subscribers, and Johnston did not receive a wage, but a profit consisting of the difference between

the retail and wholesale prices of the papers. The meaning of service for remuneration, it is said, was not determined by our prior decisions, which assumed rather than expressly decided the existence of a service relationship in those cases.

■ The word "service", as counsel suggests, varies in meaning according to the context in which it is found, and it would be impracticable, in our opinion, to attempt a definition by which to test every case that may arise. In *Creameries of America, Inc. v. Industrial Commission,* 98 Utah 571, 102 P. (2d) 300, presently to be considered, the court said:

> "It includes generally any act performed for the benefit of another under some arrangement or agreement whereby such act was to have been performed."

We agree with the statement in that case that the way "service" is used in the Act "indicates an intention on the part of the legislature to use the term in its broad general sense". It is a broad term of description "evidencing a legislative intent to give to the Act a broad and liberal coverage to the end that the far-reaching effects of unemployment may be alleviated." *Unemployment Compensation Commission v. Jefferson Standard Life Insurance Co.,* 215 N. C. 479, 483, 2 S. E. (2d) 584. And the scope and limitation of the phrase "service for remuneration" must at the last be determined by the traditional method of judicial inclusion and exclusion. See *Noble State Bank v. Haskell,* 219 U. S. 104, 55 L. Ed. 112, 31 S. Ct. 186, 32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A 487.

Whether the work done by Johnston was service for the plaintiff is a question that might well be con-

sidered settled on the authority of the Singer and Rahoutis cases, in both of which the services rendered consisted of making sales for the employer on commissions. It is true that the opinions in those cases contain no discussion of the meaning of the word "service" as used in the statute, but this is probably for the reason, as stated in the Rahoutis case, that "it is clear that the salesmen in the case at bar performed services for remuneration" (171 Or. 119). It may be assumed that we thought it clear because the business of Rahoutis, the employer, was selling real estate and the employe aided him in carrying on of that business by procuring sales of real estate owned by Rahoutis and his clients. Likewise, in the Singer case, part of the business of the Singer Sewing Machine Company was selling sewing machines, vacuum sweepers, etc., and the services of the employe consisted in aiding the company to dispose of its products to the purchasing public. It is doubtful whether discussion or definition in either case could have made the matter any clearer than the naked statement of the facts themselves.

It is not urged that we were in error in the Rahoutis and Singer cases in holding or assuming the existence of the service relationship, but the contention is that this case is to be distinguished from those precedents because here the alleged employe, instead of selling property which belonged to the employer, sold his own property. This fact is said to liken Johnston somewhat to the ordinary retail merchant, who, of course, is not an employe of the manufacturer from whom he purchases a stock of goods, although he may in a sense render the latter a service by providing a retail outlet for his product. It puts Johnston, the argument proceeds, very much in the category of the automobile

dealer whose contract requires him to handle the cars of a single manufacturer and to sell them in a defined territory and at prices fixed by the seller. Other facts referred to as heightening the analogy to the automobile dealer are that Johnston furnished his own facilities for distribution, paid his own expenses, assumed the risk of loss if patrons failed to pay, accepted payment for the subscribers in any medium that he chose, and made no reports to the plaintiff of his business dealings with the subscribers.

The foregoing catalogue of Johnston's activities is not wholly accurate. A substantial part of his expenses was paid by the plaintiff through the automobile allowance. He did not assume the risk of loss on Sunday papers, for the evidence shows that he was given credit by the plaintiff for all such papers that he was unable to sell. And, under the first contract—which is material for the reason that it was in effect during the first nine months of Johnston's base year (§ 126-702 (n), O. C. L. A.)—Johnston was required to keep accurate books of account and to make them available to the plaintiff at its pleasure and to turn them over to his successor on termination of the contract.

■ But, putting these matters to one side for the present, we think that the argument of counsel loses all its force when the real nature of the contracts between Johnston and the plaintiff is uncovered. For they provide for something quite different than the bare purchase and sale of a commodity, and the case is not to be disposed of by attaching the label "vendor-vendee" to the transaction. It cannot be denied that the sale of the plaintiff's papers to its carriers has very unusual features. Ordinarily, when a person becomes the owner of personal property by purchase he

may do with it what he chooses. He may use it himself, sell it to another for whatever price he pleases, or, if he be so minded, destroy it. But Johnston had no such rights in the papers he purchased from the plaintiff. He was not merely limited in his right of resale with respect to price and territory, as the automobile dealer may be, but *he was bound by contract to sell and deliver the papers promptly to a list of subscribers which was the property of the plaintiff and to repeat the process daily.* This, in our opinion, is the central meaning and purpose of the contracts. The circulation of a newspaper is its lifeblood; increase in circulation is valuable to the publisher because, as the circulation manager of the plaintiff testified, "the greater the circulation the greater demand the paper has as an advertising medium." And it goes without saying that subscribers who do not receive their papers would soon cease to be subscribers. The purpose of these contracts was to secure the services of Johnston as a circulator or carrier of the plaintiff's papers, to the end that promptly each day the subscriber should receive the copy to which he is entitled under his subscription contract. Whatever title to the papers was vested in Johnston was encumbered with this duty. As the New York court said in a similar case:

"While this carrier paid the appellant's inspector for the papers which he had delivered, his ownership was qualified, as they could be used only in fulfilling the publisher's contract with its subscribers and in furthering the effort of the publisher to obtain new subscribers." *In re Scatola,* 257 App. Div. 471, 472, 14 N. Y. S. (2d) 55, affirmed 282 N. Y. 689, 26 N. E. (2d) 815.

The Scatola case and *Salt Lake Tribune Publishing Co. v. Industrial Commission,* 99 Utah 259, 102 P. (2d)

307, *Creameries of America, Inc. v. Industrial Commission,* supra, and *Sisk v. Arizona Ice & Cold Storage Co.,* 60 Ariz. 496, 141 P. (2d) 395, all involved contracts similar to that with which we are now dealing and the application of provisions of unemployment compensation laws similar to those in this state, and in our opinion provide conclusive answers to the contentions now under consideration. With the possible exception of the Scatola case, it is not urged by counsel for plaintiff that these cases are not in point, but simply that they were not correctly decided.

The definition of employment in the Utah Act is in substance identical with ours, and it is further provided that:

"Services performed by an individual for wages shall be deemed to be employment subject to this act unless and until it is shown to the satisfaction of the commission that—

"(a) such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and

"(b) such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

"(c) such individual is customarily engaged in an independently established trade, occupation, profession or business."

The Utah court has construed these provisions to mean that if it appears that an individual has rendered services for an employer for wages, he is under the Act, unless all the questions suggested by the three enumerated tests be answered in the affirmative. *Globe Grain & Milling Co. v. Industrial Commission,* 98 Utah

36, 91 P. (2d) 512; *Fuller Brush Co. v. Industrial Commission*, 99 Utah 97, 104 P. (2d) 201, 129 A. L. R. 511; *Creameries of America, Inc. v. Industrial Commission*, supra.

*Creameries of America, Inc. v. Industrial Commission*, supra, involved a contract called a "franchise agreement" between a corporation engaged in the production and sale of dairy products and one Foss, by which the company agreed to sell such products to Foss at a price fixed at a discount "from the retail price posted on the Company's bulletin board", or if no price be posted then "a reasonable price shall be used as determined by the Company for similar products in the same neighborhood." The company, by a provision in the contract, loaned to the dealer a list of names, addresses and requirements of the persons who, at the date of the contract, were purchasing its products at retail within the franchise area. The company reserved to itself the good will of the retail trade within the area, a provision being made by the agreement for the "purchase" by the dealer, upon the termination of the contract, of any customers or business acquired by the latter during the life of the contract after deducting any loss thereof suffered under such period. The contract term was for one year and "thereafter from year to year, unless otherwise cancelled or terminated." The agreement was terminable by either party upon giving the other two weeks written notice. The dealer agreed not to handle products other than those of the company within the area and not to handle any such products therein, or in any wise deal with the customers relative to sale of such products for a period of two years after termination of the contract. Upon the dealer's failure to carry

out any of the provisions of the contract the company reserved the right to terminate the agreement upon twenty-four hours' written notice thereof. The agreement was not assignable without the written consent of the company, and expressly provided that it should not be construed to create the relationship of principal and agent or employer and employe, or any relationship other than buyer or seller.

The court held that this was a contract to perform personal services for remuneration, saying:

> "It is clear that Foss was performing services for the plaintiff. Although by his contract Foss was supposedly 'buying' dairy products from plaintiff and 'reselling' to certain customers, still the purchasers of the dairy products were customers of the company and not of the distributor. The customers were receiving plaintiff's products through the 'distributor'. The plaintiff never relinquished its right to those customers, and at the termination of a contract with a distributor the company had a right not only to a list of all old customers so that it could continue to supply its products to them through some other distributor, it also had the right to purchase for one dollar each the names of any new customers obtained by the distributor during his contract with the company. The dealer could acquire no customers for himself; though he was entitled to remuneration for any he might acquire for the employing unit. Certainly the distribution or 'reselling' of plaintiff's dairy products to plaintiff's customers was performing 'services' for plaintiff within the meaning of the Act.

> "That the income received by Foss from the distribution of products for plaintiff comes within the definition of 'wages' is also evident. All remuneration payable for personal services is 'wages'. We have just concluded that Foss performed 'services' for plaintiff which 'services' were per-

formed by him personally. The remuneration, therefore, which he received for those 'services' constituted wages. This remuneration was the difference between what Foss had to pay the company for the products and what he was permitted to charge for such products. He was required to pay plaintiff a fixed price for products and the appeal tribunal might reasonably find from the evidence that as a matter of fact the retail sale price was fixed by the plaintiff. The difference between those prices constituted his 'commission'."

The balance of the opinion was directed to showing that under the evidence the Commission was warranted in finding that the claimant was not free from control and supervision under his contract, and that he was not engaged in an independently established business.

The Salt Lake Tribune case involved a contract between the publisher of a newspaper and a circulator or carrier, under which the company was to furnish all newspapers required by the circulator at certain fixed prices, the papers "to be and become the property of said circulator". The latter agreed to sell and distribute the papers "as he may see fit" to purchasers or subscribers, the business to be "solely under the control and direction of said Circulator". He was required to sell the papers at a certain fixed price. He agreed to deliver them "regularly and promptly and in an acceptable manner to those purchasing them or subscribing therefor by agreement made by or in behalf of said Circulator as aforesaid." Settlement with the company for all papers delivered to the circulator was to be made every month. The contract was to run from month to month unless terminated by either party "with or without cause upon 15 days' notice in writing". Upon termination of the contract the circulator was required to turn over to the com-

pany "all paid-in-advance subscriptions, together with the names and addresses of all subscribers and the expiration of their subscriptions, with a full statement of the Circulator's claims against the Publisher, that a prompt settlement may be had as between the Publisher and Circulator."

The court held that "under the terms of such a contract it is clear that Cushing (the carrier) was to perform 'personal services' for the publishing company", citing *Creameries of America, Inc. v. Industrial Commission,* supra, decided the same day; that the amount to be received for such services constituted "wages" as that term is defined by the Unemployment Compensation Act; and that the difference between the price paid by the carrier for the papers and the price at which he sold them was remuneration "payable for personal services" which the Act defines as wages. The court then proceeded to consider the contention that even though the circulator was performing services for wages for the publisher still the three conditions set out in the statute were concurrently present so as to preclude his right to receive unemployment benefits. Upon a review of the evidence, which showed a considerable degree of supervision on the part of the publishing company's district managers of the duties of the carriers, their insistence upon prompt deliveries and diligent efforts by the carriers to get new subscribers, as well as direct contacts between the company and subscribers, as by mailing subscription cards where a new subscription was sent in by the carrier, sending out letters to delinquent subscribers to secure payment of past due accounts, and other matters, it was concluded that there was evidence sufficient to support the commission's finding that the claimant was not free from direction and con-

trol over the performance of services rendered under his contract.

*Sisk v. Arizona Ice & Cold Storage Co.,* supra, arose under the Employment Security Act of Arizona, the provisions of which appear to be identical with those of the Unemployment Compensation Law of Utah. The company there entered into an arrangement for the delivery of ice to its customers, somewhat similar to the arrangement in the Creameries of America case. Written contracts provided for the purchase of ice by the alleged employes and its resale to the company's customers over prescribed routes. We deem it unnecessary to go into detail concerning the terms of the contracts and the evidence. It is sufficient to say that, notwithstanding the agreement for sale and purchase of the company's products, the court held that the individuals who delivered the ice performed services for the company, that the difference between what the company charged them for it and what they received from the customer constituted wages, and that the company was an employer subject to the Act.

*In re Scatola,* supra, was also a case in which a carrier of newspapers to the publisher's subscribers was compensated for his services by the difference between the amount he paid for the papers and the amount he collected from the subscribers. The Appellate Division of the New York Supreme Court, in an opinion from which we have already quoted, held that the carrier was not an independent contractor, but an employe and under the Unemployment Insurance Law. The Court of Appeals affirmed in a memorandum decision. Amici curiae say the case is distinguishable because the publisher gave the carrier a guaranty

against loss; but we can find nothing in the opinion which supports that statement. They also suggest that there are differences in the New York statute (Labor Law, Consol. Laws c. 31, § 500, et seq.) that might account for the decision. The state of the decisions in New York construing the Unemployment Insurance Act is, as we observed in the Singer case, "unsettled", but we are confident that the definitions of employment and remuneration in our statute are as broad as anything to be found in the New York law. And, in deciding the Scatola case, the court apparently applied common law standards.

*Washington Recorder Publishing Co. v. Ernst,* 199 Wash. 176, 91 P. (2d) 718, 124 A. L. R. 667, is contrary to the decisions just reviewed. It is not relied on by the plaintiff, whose counsel say in their brief that it "is of no assistance to the court one way or the other in answering the question now presented." We are inclined to agree with this statement. The basis of the decision, as we read the opinion, is that the common law test of master and servant governed and that the carriers were independent contractors. The court said that "in drafting the statute the legislators attempted to codify the common law", and suggested that if the term "employment" were extended to include independent contractors there would be a question as to the constitutionality of the Act. The decision is in obvious conflict with the earlier case of *McDermott v. State,* 196 Wash. 261, 82 P. (2d) 568, and the subsequent adjudications in Washington. *Sound Cities Gas & Oil Co. v. Ryan,* 13 Wash. (2d) 457, 125 P. (2d) 246; *In re Foy,* 10 Wash. (2d) 317, 116 P. (2d) 545; *Mulhausen v. Bates,* 9 Wash. (2d) 264, 114 P. (2d) 995. *Amici curiae* seek to make something out of the statement in the Mul-

hausen case that the basis for the Washington Recorder decision was "that the relation of vendor and purchaser existed between the publishing company and the paper carriers; that the carriers bought and became the owners of the commodity (newspapers) and sold it on their own account." It is, of course, for the Washington court to construe its own decisions; but, whatever value the Washington Recorder case may have as authority in that state, we think it can be accorded none here.

*Idaho Times Publishing Co. v. Industrial Accident Board,* 63 Idaho 720, 126 P. (2d) 573, is another case cited in the briefs which passed upon the employment status of newspaper carriers, who were held to be not under the Idaho Unemployment Compensation Law. It is conceded on all sides that, for a variety of reasons, the case is not in point here, and it, therefore, calls for no discussion. This is likewise true (so far as the question of what constitutes "service for remuneration" is concerned) of *California Employment Commission v. Los Angeles Down Town Shopping News Corp.,* 24 Cal. (2d) 421, 150 P. (2d) 186, and *California Employment Commission v. Bates,* 24 Cal. (2d) 432, 150 P. (2d) 192.

We think that no good purpose would be served by examining cases at common law in which the question of a publishing company's liability for the tort of its carrier is at issue. They can have but little materiality to the present inquiry. Scarcely more pertinent are decisions under Workmen's Compensation Acts. A number of these have arisen in California, and it has been held that the carriers are not employes within the meaning of the act involved. See *State Compensation Insurance Fund v. Industrial Accident Commis-*

*sion*, 216 Cal. 351, 14 P. (2d) 306; *New York Indemnity Co. v. Industrial Accident Commission*, 213 Cal. 43, 1 P. (2d) 12; *Batt v. San Diego Sun Publishing Co.*, 21 Cal. App. (2d) 429, 69 P. (2d) 216. But these cases were decided under definitions of employment less inclusive than that contained in our Unemployment Compensation Act, and the courts' opinions, moreover, evidence a tendency to adhere to the common law notion of master and servant.

*Globe Indemnity Co. v. Industrial Accident Commission*, 208 Cal. 715, 284 P. 661, is not without value because of a feature which it has in common with the instant case. A typical newspaper carrier contract seems to have been involved. The court said that the record showed that the carrier "paid to the Tribune Publishing Company $1.50 per hundred for the newspapers and collected eighty-five cents per month from each subscriber, which he retained and for which he receipted on printed forms furnished by the Tribune Publishing Company. He was also paid $3 a month additional, which was intended to compensate him for the extra expense of distribution because of the large and scattered territory." It was held that an employment relationship existed within the meaning of the Workmen's Compensation Law. This case was reviewed in *New York Indemnity Co. v. Industrial Accident Commission*, supra, and distinguished from the latter case with the statement that "the evidence showed that an express relation of agency for the distribution of the daily issues of the Oakland Tribune to its subscribers in San Rafael existed between the applicant for an award and the publishers of said newspaper, in pursuance of which the applicant not only received a percentage of the monthly price which the subscribers

paid, but was also paid a regular sum in addition thereto to cover the cost of distribution in outlying territory." See, also, *State Compensation Insurance Fund v. Industrial Accident Commission,* supra.

The "percentage" thus referred to was, as the language which has been quoted from the Globe Indemnity case shows, the difference between what the carrier paid for the papers and what he sold them for, and the emphasis placed by the court upon the payment of $3.00 a month to the carrier is of particular interest here because Johnston likewise was paid a sum of money "to compensate him for the extra expense of distribution because of the large and scattered territory". This was the automobile allowance, which, according to the evidence of Mr. Peterson, circulation manager of The Journal, was granted "in order to make it possible for the auto route carrier to make a profit similar to the little merchant" (i. e., the city carrier). The Commission found that this allowance ranged from $47.00 to $78.00 a month. It varied in accordance with changes in the size of the territory which Johnston was required to cover, and was based approximately on an estimated expense of three cents a mile for operation of Johnston's automobile, an amount which, we may almost take judicial knowledge, would not be adequate to cover such expense.

Concerning this allowance the Commission found:

"The amount of the automobile allowance was predicated upon the estimated expense of operating an automobile over the routes designated, and such allowance was changed from time to time as the route was changed. While the claimant was not required by the contracts to use an automobile, he did use such vehicle and it would be practically impossible for him to have covered the routes by

any other method. The automobile allowance was intended for and accepted in the nature of payment of rental for use of such vehicle, and not for services rendered. In the event the cost of operating the automobiles was either more or less than the allowance granted therefor, nevertheless such gain or loss was not in respect to wages for services performed since it was not predicated upon labor as service but rather on estimated costs of operations.''

▆ Only the first two sentences just quoted contain findings of fact. The rest comprise conclusions of law, which, in our opinion, are not justified by anything in the evidence. We have quoted the testimony which shows why the allowance was granted. If an employer pays his employe more than he otherwise would because of expense that the employe incurs in rendering services, the amount so paid is part of the employe's remuneration for his services. There is no basis for the rental theory adopted by the Commission, and the facts concerning the automobile allowance constitute substantial evidence, as in the Globe Indemnity case, that Johnston performed services for the plaintiff for remuneration.

The recent decision of the Supreme Court of the United States in *National Labor Relations Board v. Hearst Publications, Inc.*, 322 U. S. 111, 88 L. Ed. 1170, 64 S. Ct. 851, also has its bearing on the question in this case. It was there held, without the aid of broad statutory definition, that newsboys selling newspapers on the streets of Los Angeles, who bought the papers and resold them at a price fixed by the publisher, were ''employees'' within the meaning of the term as used in the National Labor Relations Act. Construing the term in the light of the objectives sought to be achieved by Congress the court rejected

the technical distinctions which have grown up in the law of master and servant, saying:

"Enmeshed in such distinctions, the administration of the statute soon might become encumbered by the same sort of technical legal refinement as has characterized the long evolution of the employee-independent contractor dichotomy in the courts for other purposes."

■ Amici curiae seek to support the contention that Johnston did not perform services for an employer with the assertion (which, incidentally, counsel for plaintiff do not make) that the subscribers are not the customers of the plaintiff but of the carrier. We think this is an untenable position. No authority has been cited for it, and in the only cases we have seen where the question is discussed at all, the courts, under a like state of facts, have treated the contracts of subscription as contracts between the publisher and the subscribers. In the case of *In re Scatola*, supra, the court said that the papers furnished to the carrier "could be used only in fulfilling *the publisher's contract with its subscribers*" (italics supplied). In *Bohanon v. James McClatchy Publishing Co.*, 16 Cal. App. (2d) 188, 201, 60 P. (2d) 510, the court said of a provision of the contract requiring the carrier to turn over to the publisher advance subscription payments (there is a similar provision in the second contract in this case):

"If Engebrecht (the carrier) should collect some considerable amount of money in subscription payments for appellant's paper from subscribers who should elect to pay for several months or, conceivably, for years in advance and Engebrecht's relationship with appellant should be terminated prior to the expiration of the time covered by such payments, appellant's business might be seriously

handicapped if such advance payments had not been turned over to it. Subscribers who had made such advance payments would be entitled to receive delivery of newspapers by carrier and *appellant would be obligated to make such delivery without perhaps receiving any compensation for its product.*" (Italics supplied.)

In *Salt Lake Tribune Publishing Co. v. Industrial Commission,* supra, 99 Utah at p. 265, the court said:

"The evidence further shows that the subscribers were the customers of the company rather than of the individual carriers. A carrier received nothing from his route other than what was received by the distribution of newspapers to subscribers during the life of his contract with the company. At the termination thereof all paid in advance subscriptions had to be turned over to the company, together with a list of all subscribers who continued to receive the newspaper from some other carrier. In its effort to maintain these subscribers and obtain new ones, the company was continually offering inducements to the carriers, 'supervising' their work, and requiring them to do particular acts designed to effectuate the ends of the company."

We think that the view expressed in these decisions is the only permissible one. The clause in the second contract requiring advance payments to be remitted to the plaintiff is a clear recognition by it of its obligation to the subscribers. As to subscription contracts already in existence before Johnston took over the route, it would seem to be idle to assert that they were contracts between the subscribers and some prior circulator of The Journal who was unable to fulfill them. If they were not the plaintiff's contracts, what did it mean by undertaking to "lease" them to Johnston? And, since, as the record indicates, upon the termina-

tion of the contract with Johnston the plaintiff entered into a similar arrangement with his successor, it follows that it treated in the same fashion any additional subscriptions which Johnston obtained. It is no doubt true, as counsel for Oregonian Publishing Company say, that, with the possible exception of advance payments, the plaintiff had no right to collect from the subscribers as long as Johnston's contract continued in effect. But that was because of the terms of a contract to which the subscribers were not a party and which could in no way affect the legal relations between them and the plaintiff. Both the right of the carrier to terminate the contract on thirty days' notice and the plaintiff's power to cancel it for good and sufficient reason, are inconsistent with the theory that any subscriptions which Johnston might obtain would create contracts between himself and the subscriber, rather than contracts between the subscriber and the plaintiff; and, it is to be observed in this connection that the circulation manager of the plaintiff testified that the carriers, both in the city and on rural routes, were paid commissions on such subscriptions.

The decisions in the American Creameries case and Arizona Ice & Cold Storage case are, also, authority opposed to the contention under consideration; and there was ample warrant, in our opinion, for the Commission's conclusion that Johnston performed services for the plaintiff within the meaning of the Act.

■ We take up next the contention that Johnston's earnings did not constitute "remuneration" or "wages". It is argued that these words mean something that moves from the alleged employer to the alleged employe for the services rendered, and for which the latter could sue the former; whereas John-

ston received his compensation from his customers for merchandise sold to them and not for services for an employer. Certain provisions of the statute are said to sustain this contention. Thus, it is provided that contributions to the unemployment compensation trust fund "regularly payable by each employer shall be an amount equal to 2.7 per cent of the payroll of employers as herein defined", § 126-716 (a), O. C. L. A., and payroll is defined in §126-702 (i) to mean and include "all wages, salaries and remuneration payable to employes in any employment subject to this act". Provision is made for computation of future contributions to the fund in the light of "benefit experience", and in that connection the statute speaks of "average annual payroll", which is defined as "the average total amount of wages payable annually by an employer", §126-716 (b), (2), (3). Again, by §126-721 (a) every employing unit is required to keep true and accurate records of all persons employed by it, and such records of hours worked, wages paid, and other statistics as prescribed by the commission, and it is provided that such records shall be open to inspection by the commission, and that the commission may require from any employing unit reports on wages, hours, employment, unemployment and related matters concerning its employes.

It is argued that the last requirement is impossible of application to this case because the plaintiff has no means of getting the information necessary for keeping such records, and that the other provisions referred to clearly show that the remuneration of which the statute speaks must be something payable only by the employer.

We think that this is too narrow and technical a view and one which has not met judicial approval in closely analagous cases. In addition to cases hereinbefore discussed, we call attention to the following: In *Kaus v. Unemployment Compensation Commission*, 230 Iowa, 860, 299 N. W. 415, the question was whether certain taxicab drivers were covered by the Iowa compensation law. The alleged employer furnished the cabs, and the drivers operated under an oral arrangement by which they furnished the gasoline and tire repairs and paid the alleged employer $3.00 for each twelve-hour period, retaining as their compensation all sums collected by them from passengers in excess of $3.00 and the cost of the gasoline. The definition of wages in the Iowa law is "all remuneration payable for personal services, including commissions and bonuses, and the cash value of all remuneration payable in any medium other than cash." This provision has substantially the same meaning as §126-702 (g), O. C. L. A., which reads: " 'Wages' means all remuneration for employment, including the cash value as determined by the commission under its regulations, of all remuneration payable in any medium other than cash." And the Iowa statute contains a provision that "* * * contributions shall accrue and become payable by each employer with respect to wages payable for employment as defined in * * *". Addressing itself to an argument similar to that now under consideration, the court said:

> "Nor is the fact that the drivers are not paid a stated wage by appellee necessarily inconsistent with the claim made by the Commission. It is to be noticed that the statutory definition of the term 'wages' contained in the law (section 1551.25(M) ) is 'all remuneration payable for personal services,

including commissions,' etc. It is not required that the remuneration be paid by the employer. It has frequently been held that payment by the employer is not necessary. Remuneration of an employee may consist of the difference between the price which he pays his employer for goods and the price at which he sells them, a percentage of the sale price of goods sold by the employee to customers and collected by him from them, and various other methods of collecting compensation from customers rather than directly from the employer. (Citing cases) The earnings of the drivers over and above the $3 and cost of the gasoline constitute the remuneration of wages for their services and it is not necessary that they be paid directly by appellee.''

*Jones v. Goodson*, 121 Fed. (2d) 176, a decision of the Circuit Court of Appeals for the Tenth Circuit, opinion by Circuit Judge Bratton, involves the construction of the Oklahoma Unemployment Compensation Law and its application to taxicab drivers operating under an arrangement similar to that in the Kaus case, and announces the same principle as that case does with respect to the point now under consideration.

In *Power's Case*, 275 Mass. 515, 176 N. E. 621, 75 A. L. R. 1220, (opinion by Rugg, C. J.) it was held that tips received from patrons by a waitress in a restaurant, with the knowledge and approval of the employer, should be considered in determining the amount of the waitress's average weekly wages for the purpose of fixing the employer's contributions under the Massachusetts Workmen's Compensation Act.

In *Jack & Jill, Inc., v. Tone*, 126 Conn. 114, 9 Atl. (2d) 497, salesmen for a manufacturer of ice cream, who operated under a contract by which they bought the ice cream from the employer and whose compensa-

tion consisted of the difference between the price at which the products were sold and the price paid to the company, were held to be employes within the meaning of the Unemployment Compensation Act of Connecticut.

*Matter of Glielmi v. Netherland Dairy Co., Inc.,* 254 N. Y. 60, 171 N. E. 906, opinion by Judge Cardozo, is a decision to the same effect involving similar facts in a case arising under the New York Workmen's Compensation Act.

Numerous other cases containing similar holdings are cited in *Jones v. Goodson,* supra.

"Remuneration" in the statute is not a word of narrow significance. That it includes commissions has already been determined in the Singer and Rahoutis cases. The provisions of the statute, § 126-702 (g) that "for the purpose of determining the contribution of an employer if a workman is not employed at a fixed wage, after a fair hearing, the commission may establish a minimum wage at which such workman shall be carried on the payroll of the employer" and that "'payroll' means and shall include *all* wages, salaries *and remuneration*" (italics supplied), §126-702 (i), conclusively show that remuneration includes compensation other than wages or salaries. In our opinion, the word was used advisedly as one of broad meaning in order that the objects of the Act might be achieved. The provisions of the statute on which counsel rely cannot be held to restrict this meaning so as to put outside the scope of the Act cases such as this which fall within its spirit and purpose. It must not be forgotten "that this remedial legislation should be liberally construed to the end that employees receive the benefits intended and thereby effectuate the pur-

pose of the act.'' *(Puget Sound B. & D. Co. v. S. U..C. C.,* 168 Or. 614, 620, 126 P. (2d) 37.)

The plaintiff cites *Fuller Brush Co. v. Industrial Commission,* supra, where it was held that salesmen selling the products of Fuller Brush Company were not under the Utah Act. The basis of the decision was that under the facts the salesmen did not perform services for wages for an employer. In the course of the opinion the court had the following to say concerning the nature of wages:

> ''The essential elements of wages are that they form a direct obligation against the employer, in favor of the employee; that when the service is performed the compensation, if any, accrues and becomes payable regardless of the success or failure of the undertaking; that any profits or earning over and above costs of the service accrues to the employer, and any loss as a result of the undertaking or service must be borne by the employer. It is not essential that the wage move directly from the employer to the employee, as where the employee works on commissions, deducts his commission from a collection and remits the 'nets', but it is essential that the remuneration accrues from the product or service of the employer, and would accrue to him except for the fact that the employee is entitled to retain or receive it as remuneration under his contract of hire.''

The court found that the salesmen for Fuller Brush Company made outright purchases of the company's products, resold them at retail prices which they could fix themselves, furnished the company no list of customers, and built up their own good will and not that of the company. It was held that, since there was no obligation on the part of the company to pay the plaintiff anything for his services but he was obliged to

get his remuneration, if any, from his ability to sell the company's products at an advanced price over the cost to him, the claimant did not render service for wages or under a contract of hire.

We will not stop to dwell upon the obvious points of distinction between the Fuller Brush case and the case at bar. The Utah court itself made these plain in distinguishing its prior decisions in the Salt Lake Tribune case and Creameries of America case, and there is no warrant, in our judgment, for asserting that those decisions were overruled. Some of the language used by the court in defining wages seems to be out of harmony with the law as we understand it and as it has been announced in numerous cases hereinbefore cited, though it may not be so when considered in the light of the facts with which the court was dealing.

■ However that may be, we cannot accept the doctrine that wages, or remuneration, as used in our Unemployment Compensation Law, necessarily connotes a direct obligation from employer to employe, or that compensation for services ceases to be remuneration because the individual performing the services agrees, in effect, to assume a measure of risk of loss resulting from the delinquencies of his employer's customers. See, *L. B. Price Mercantile Co. v. Industrial Commission,* 43 Ariz. 257, 260, 30 P. (2d) 491.

■ As to the argument respecting the duty of the employer to keep records and make reports to the Commission, we think the following quotation from the Powers case, supra, furnishes an adequate answer:

"Some difficulty may arise in fixing the rate of insurance to be charged by the insurer to the employer over that existing in cases where the pay-

roll of the employer discloses all the earnings of the employee. But that cannot affect the principle. The employee, a part of whose earnings comes from tips received in consequence of his service to the employer, is bound to make full disclosure for the purpose of enabling just insurance rates to be fixed.''

Johnston was under a like duty, and it is worthy of note that the first contract contains a clause requiring him to furnish the plaintiff much of the information called for by the statute.

We conclude that the plaintiff's contract with its carrier is a contract for the performance of services for remuneration. The distinctions between this case and the Singer and Rahoutis cases suggested by counsel are based on the form of the transactions rather than their substance. That they might be deemed important if we were dealing with the subtleties of the law of independent contractor in a tort action (see, e. g., *Bohanon v. James McClatchy Publishing Co.*, supra, 16 Cal. App. (2d) at p. 196) is no reason why they should be determinative of questions of coverage under the Unemployment Compensation Law. And to give them controlling effect here would open the way for evasions of the Act.

 In any event there is ample, substantial evidence to support the Commission's findings that Johnston performed services for remuneration for the plaintiff, and, that being so, we are without power to disturb those findings. *Rahoutis v. Unemployment Compensation Commission*, supra; *Puget Sound B. & D. Co. v. S. U. C. C.*, supra, 168 Or. at p. 625; *Layman v. S. U. C. C.*, 167 Or. 379, 385, 117 P. (2d) 974, 136 A. L. R. 1468.

While the distinction between Johnston and the automobile dealer to whom he is compared may be somewhat obscured by certain points of resemblance, it is none the less real and vital, because the automobile dealer may sell when he pleases and to whom he pleases. He sells for himself to his own customers, not the manufacturer's, and is not hired to deliver a new car every day to a list of customers of the manufacturer. He is in fact in the same class, so far as the present question is concerned, with the proprietor of a newsstand who buys the plaintiff's papers and resells them in the regular course of his business. The newsstand proprietor acquires absolute title to the papers and disposes of them as he sees fit. His relations with the plaintiff, it may be assumed, terminate upon the completion of each transaction of sale and purchase, and he is under no obligation, continuing or otherwise, to serve the plaintiff in any way.

Logically, if Johnston worked for commissions, designated as such, as in the Singer and Rahoutis cases, the basis for the attempted differentiation would vanish. But, if the plaintiff's argument were to prevail, it would be entirely possible that, as between two men doing precisely the same work as carriers of the plaintiff's papers, one would be under the Act and the other would not, merely because of the method adopted for the payment of their compensation, notwithstanding that in each case the measure of such compensation was the difference between the wholesale and retail prices of the papers. We think that no such result was within the legislative purpose.

Counsel amici curiae call our attention to the provision of subdivision (e) of § 126-702, O. C. L. A., which authorizes an employing unit, for which services that

do not constitute employment as defined in the Act are performed, to file with the Commission a written election that all such services performed by individuals in its employ shall be deemed to constitute employment for all the purposes of the Act. It is argued that even though Johnston was performing services for the plaintiff, still these services were not for remuneration, and that it was cases of this type that the legislature had in mind when this elective provision was put into the law. It may be observed in passing that the contention is inconsistent with counsel's argument based on the supposed impossibility in this case of complying with the provisions respecting the employer's payroll, the keeping of records, and the making of reports to the commission, since those provisions would be still applicable even though the employer became subject to the Act by his own election. We think, however, that the elective provisions were not enacted to meet cases of this kind, but that it is more probable that they were intended to apply to those classes of service, such as agricultural, domestic, etc., which are expressly excluded from the term "employment" by subparagraph (F) of subdivision (f), § 126-702. In any event, the suggestion is of no aid in determining Johnston's status, for it does no more than beg the question whether he performed services for remuneration.

Since, in our opinion, the evidence shows, and the Commission was warranted in finding, that Johnston performed services for remuneration for the plaintiff, it follows that he was covered by the Act unless the plaintiff has met the tests prescribed in § 126-702 (f), (E). Counsel for the plaintiff concede the absence of proof that Johnston was engaged in an independently established business of the same nature as that involved

in the contract of service. But they urge that he was free from control or direction over the performance of his services, and that in some cases, at least, of which this is said to be one, even though the test of an independently established business cannot be met, if the individual is free from control he is not to be deemed an employe. We are unable to follow the argument advanced in support of this contention (which is opposed to what we said on the question in the Rahoutis case), but it is unnecessary to pursue the matter because we are of the opinion that there is substantial evidence in the record that Johnston was not free from control by the plaintiff in the performance of his services.

 The reservation in an alleged employer of the power of control, whether actually exercised or not, constitutes control; for the statute demands freedom from control "both under his contract of service and in fact". The test is the same as that applied by the courts in determining whether one is a servant or an independent contractor, that is to say, it is not "the fact of actual interference or exercise of control by the employer, but the existence of the right or authority to interfere or control", 27 Am. Jur., Independent Contractors, 487, § 6; *Larkins v. Utah Copper Co.,* 169 Or. 499, 506, 127 P. (2d) 354. And in ascertaining whether this right or authority exists "no single fact is more conclusive * * * than the unrestricted right of the employer to end the particular service whenever he chooses, without regard to the final result of the work itself": *Cockran v. Rice,* 26 S. D. 393, 397, 128 N. W. 583, Ann. Cas. 1913B, 570. To the same effect see *L. B. Price Mercantile Co. v. Industrial Commission,* supra; *Industrial Commission v. Bonfils,* 78 Colo. 306, 241 P. 735; *Bowen v. Gradison Construction Company,* 236 Ky. 270, 32 S. W. (2d) 1014; 217

Am. Jur., *ibid.*, 501, § 21. There are authorities to the effect that stipulations authorizing the employer to terminate the contract under certain specific circumstances have a tendency to show that the person employed is a mere servant, though there are decisions to the contrary: 20 A. L. R. 763. In *Press Publishing Co. v. Industrial Accident Commission*, 190 Cal. 114, 210 P. 820, where the question was whether a newspaper carrier, who was paid a weekly salary, was an employe, within the meaning of a Workman's Compensation Act, it was held that the right reserved to the employer to discharge the carrier "for unsatisfactory services" "made obligatory any instructions given, for it gave to the Press Publishing Company the power to require obedience to those instructions and insured their being carried out."

The representatives of the plaintiff evidently so interpreted their powers under the clause in the second contract which authorized the plaintiff to "cancel this lease at any time for good and sufficient reason". There is evidence that the plaintiff's district manager, having jurisdiction over the territory which included Johnston's routes and whose duty it was to see that the contracts with the carriers and dealers were lived up to, discontinued the Benton County route while the first contract was in effect and offered Johnston his choice of two other routes. The circulation manager of the plaintiff testified that the plaintiff had the right to discontinue a route if it decided that it was not profitable. There is evidence that the district manager took away from Johnston a part of his territory, at the same time reducing his automobile allowance.

Other indicia of the exercise of control disclosed by the evidence are that Johnston was required to attend

meetings of the carriers at which pep talks were made and instructions given as to how to build up the circulation of The Journal; that the district manager directed him to be on time to receive his papers when they arrived by bus so that they would be delivered promptly to the subscribers; that, while working on the Linn County route, he was required to, and did, depart from his regular course and pick up bundles of the Albany Democrat-Herald and a mail-sack and deliver them at various designated towns along the route, receiving no additional remuneration for this service other than an increase in his automobile allowance; and that on at least one occasion he was instructed by the district manager to redeliver a paper to a customer from whose paper box the paper had been taken by unauthorized persons. The evidence also shows that Johnston was finally discharged because the district manager considered that he was not producing results nor using sufficient diligence in soliciting new subscribers.

With respect to some of the foregoing facts the Commission said in its findings:

"The Commission finds in these matters that any established exercise of material direction and control of such district manager did not actually go beyond the insistence that claimant fulfill the obligations of the written terms of his agreement."

This, of course, is not a finding of fact binding on this court, but a conclusion of law based on the Commission's interpretation of the contract; and it is our opinion that the evidence discloses that in some of the particulars enumerated the control exercised by the plaintiff over Johnston's services did in fact go beyond the provisions of the contract.

Moreover the plaintiff was under no contractual obligation to pay the automobile allowance and could have discontinued it at any time, thus making it impossible for Johnston to perform the services without loss and effectually terminating the contract.

■ It should be borne in mind that under these contracts, "a continuity of service was contemplated rather than a definite specified job": *Press Publishing Co. v. Industrial Accident Commission,* supra. In view of this fact we think that the right reserved by the plaintiff to terminate the contract for good and sufficient reason carried with it the power of direction and control over the carriers' services; and we cannot say that there is no foundation in the evidence for the finding of the Commission that such direction and control were in fact exercised.

■ The plaintiff contends that the evidence before the Commission does not support a finding that claimant's earnings were sufficient to entitle him to unemployment benefits. Under § 126-704 (e) an unemployed individual is eligible for benefits if the Commission finds that "he has during his base year earned wages for employment by employers equal to not less than two hundred dollars ($200)". This provision is an amendment, passed in 1939, of § 4, Ch. 70, Oregon Laws 1935, Special Session, as amended by § 3, Ch. 398, Oregon Laws 1937. See Ch. 515, § 3, p. 1070, Oregon Laws 1939. By the terms of the 1937 amendment an unemployed individual is eligible for benefits if the Commission finds that "he has in his base year earned wages of not less than sixteen times his weekly benefit amount." Johnston was awarded a weekly benefit of $7.00, and, if the latter amendment is applicable, he must have earned $112.00 in his base year in order

to be eligible for benefits. It would seem that this case is governed by the 1937, rather than the 1939, amendment, but the point need not be decided because the Commission could properly find, under the evidence, that the wages earned by Johnston were sufficient to qualify him for benefits under either provision. In determining the question the Commission took into consideration only the difference between the price charged Johnston for the newspapers furnished him by the plaintiff and the retail price charged the customers. It ignored the automobile expenses as well as the allowance made by the plaintiff on that account. In other words, the Commission based its finding on the amount of Johnston's gross earnings, which were in excess of the amount required to make him eligible for unemployment benefits under either of the provisions referred to.

The plaintiff says that this was error. It argues that the wages of which the statute speaks means the employe's net earnings, that any expense incurred in performing the services must be deducted from what he receives for his services, and that the evidence as to the cost of operation of the automobile is so vague and speculative that it is impossible to determine the amount of Johnston's net earnings.

Regardless of this criticism of the evidence, we think that the Commission was justified in the course it took. We are not dealing with an income tax law. The statute does not speak of net wages, and the wages or remuneration earned by an employe, in our opinion, means the amount he receives for his services even though he may incur expense as an incident to their performance. The administrative difficulties—pointedly illustrated by the instant case—which would be

encountered, were plaintiff's contention to be sustained, furnish additional reason for holding that it is not in accord with the intent of the legislature.

The same question arose under the Unemployment Compensation Law of Illinois in the case of *Rozran v. Durkin*, 381 Ill. 97, 45 N. E. (2d) 180, 144 A. L. R. 735. The employe in that case delivered packages for a partnership engaged in the general pickup and delivery service under an agreement by which he was to receive a fixed percentage of the gross income from deliveries. He furnished his own truck and paid the cost of its operation. The evidence as to that cost was speculative. In answering an objection similar to that which the plaintiff has made here, the court said:

> "We do not think there is merit in the contention of plaintiff in error that Kuehl did not earn sufficient wages to qualify for benefits. During the period he was employed, he earned $378.78 in wages. The sum of $225 was necessary to be earned by him during the base period in order to entitle him to compensation. There was nothing in the contract for employment that considered anything but gross earnings, and a speculative amount for net earnings will not be entertained."

See, also, 48 Am. Jur., Social Security, 522, § 14.

There was basis in the evidence, in our opinion, for the Commission's finding as to the amount of Johnston's wages, and, since, as we have concluded, Johnston was an employe of the plaintiff within the meaning of the Unemployment Compensation Act, the award of compensation to him should not be disturbed.

The decree of the Circuit Court sustaining the award is therefore affirmed.

ROSSMAN, J. (dissenting).

July 1, 1937, the plaintiff and James R. Johnston, with whose status this proceeding is concerned, signed a contract which is quoted in the majority opinion. July 1, 1938, according to the express findings of the defendant Commission, that contract was "mutually cancelled." Upon the same day the parties effected a new agreement which they reduced to writing December 1, 1938. It, too, is quoted in the majority opinion. March 1, 1938, the Journal (plaintiff), pursuant to the privilege afforded by the eighth paragraph of the contract, canceled it. The validity of its action and the sufficiency of the grounds upon which it was based are not challenged.

Under the procedure pursued by the Commission, Johnston's base year began August 31, 1937, and ended September 30, 1938. Hence, three of the months, July, August and September of 1938, were covered by the contract which he and the Journal effected July 1, 1938. Therefore, unless in those three months he was an employee of the Journal within the contemplation of our Unemployment Compensation Act, §§ 126-701–126-729, O. C. L. A., the Journal is entitled to prevail in this proceeding. It is, of course, essential that he have been an employee in the other nine months of that base year; but, unless the contract of December 1, 1938, constituted him an employee, the Commission's finding, which held that Johnston was the Journal's employee throughout the above-mentioned base year, cannot be sustained. Therefore, the contract which the parties signed December 1, 1938, is of controlling importance.

The contract of December 1, 1938, reads as follows:

"The undersigned acknowledge receipt from The Journal, of Portland, Ore., of a list of subscribers

who purchase The Journal and who live on a certain paper route near Corvallis, Oregon, which list of subscribers and paper route is hereby leased to me by The Journal, and in consideration thereof I hereby agree to and with The Journal, as follows:

"(1) That I will sell and regularly and promptly deliver The Journal to all said subscribers, at the rate therefor.

"(2) That I will not sell or deliver any other newspaper to any person without the written consent of The Journal.

"(3) That I will do all in my power to promote and extend the circulation of The Journal.

"(4) That prior to giving up said paper route I will give The Journal 30 days notice of my intention so to do.

"(5) That I will not turn over said list of subscribers to any person nor disclose the name of any subscriber for The Journal without first obtaining the consent of The Journal.

"(6) That I have not paid any money to any person for this list of subscribers, and that I will not sell it to any person or persons for any money. That I will make no attempt to collect in advance from any of my subscribers, but should any subscriber choose to pay in advance I will remit to The Journal immediately.

"(7) That I will regularly and promptly pay on the 10th day of each month for all copies of The Journal sent to me in accordance with my orders, at the wholesale rate of $1.50 per hundred for all daily weekday papers, and at the wholesale rate of $6.00 per hundred for all Sunday papers.

"(8) The Journal may cancel this lease at any time for good and sufficient reason, and when so cancelled I agree to forthwith turn over to The Journal, or its authorized representative, the names of all subscribers to whom I have been delivering The Journal, and I agree to keep a written list of

all such persons, with their street addresses, and that such written list shall be the property of The Journal.

> Carrier's Signature, J. R. Johnston.
> Accepted by M. H. Pflaum
> for The Journal Publishing Co."

The manner in which the parties discharged the contractual duties created by the contract is thus stated in the brief which the Commission's counsel filed in this court:

> "Claimant from time to time ordered from appellant the amount of newspapers he currently needed, which amount appellant sent him until a change in number was ordered. Appellant charged claimant the agreed wholesale prices and claimant sold the newspapers at the retail price to the subscribers on his rural route, delivering the same into the paper boxes along the route, collected from the subscribers the retail prices and paid monthly to appellant any difference owing the appellant between the wholesale bill, the automobile allowance and other credits."

The findings entered by the Commission state:

> "Claimant from time to time ordered from the Company the amount of newspapers he currently needed, which amount the Company sent him until a change in number was ordered. The company charged claimant with the agreed wholesale price and the claimant sold the newspapers at retail prices to the subscribers on his rural route, delivering the same into the paper boxes along the route, collected from the subscribers the retail price, and paid monthly to the Company on its bill any difference owing the Company between the wholesale bill and the automobile allowance and other credits * * *. The Company's district manager had on one or two occasions warned the circulator or carrier concerning being late in receiving the newspapers for de-

livery and had on at least one occasion demanded of the carrier that he redeliver a paper to some customer from whose paper box the paper had been taken by unauthorized persons. There is also some evidence to indicate that on one occasion the district manager had objected to claimant's wife taking over the deliveries. The Commission finds in these matters that any established exercise of material direction and control of such district manager did not actually go beyond the insistence that claimant fulfill the obligations of the written terms of his agreement * * *.

* * *

"The Commission finds from the examination of such accounts that the Company sold newspapers and charged the wholesale price against the claimant during his base year as follows: For daily week-day papers, a total of $338.54 and for Sunday papers a total of $308.64. In the event the claimant sold such papers at stipulated prices during such base year, his gross profit from such sales amounted to $446.10. There is further added to such gross profit the sum of $6.64 * * *.

* * *

"It is further found that since claimant was entitled to and did change his orders for newspapers from time to time as his subscribers grew or decreased in number, it cannot be assumed he had remaining any material number of newspapers unsold and upon which he may have suffered a loss.

"The Commission also finds that in such cases where the claimant had sold newspapers to some subscribers who did not pay for the same, no deduction can properly be made from the amount of remuneration credited as wages, since the claimant was then the owner of an account receivable which was a property right existing in him. * * *

"Claimant's net remuneration in the instant case is that amount of money representing the dif-

ference between the wholesale charges for the news-
papers deducted from the retail value of the same
* * * ''

The above indicates that Johnston was at liberty to
order any number of papers he wished delivered to
him. He was charged their wholesale price and at the
end of the month the Journal presented him with its
bill. In turn, Johnston sold the papers which he had
purchased to the people along his route. It is evident
that Johnston was the owner of the papers in which he
dealt, and, of course, was the owner of the vehicle in
which he delivered his papers. The Commission even
found that he, and not the Journal, was the owner of
the account receivable which arose when a customer
failed to pay for papers delivered.

The findings above quoted state that the Journal's
district manager spoke to Johnston on a couple of occa-
sions concerning the manner in which he was discharg-
ing his contractual duties. They mention the incidents
and then conclude that the district manager asked of
Johnston nothing more than that he "fulfill the obli-
gations of the written terms of his agreement." I
think that that is a finding of fact and not a mere
conclusion of law. Therefore, the written agreement,
and that alone, determines the nature of the relation-
ship which existed between Johnston and the Journal.

The contract does not confine Johnston to any given
area nor to any specific number of customers. He was
at liberty to extend his route and increase the number
of his customers to any extent that he wished. He
could grant credit or withhold it as he chose. Some
of his debtors failed to pay him, and in those instances
he suffered the loss. The Journal charged him the
wholesale price for all papers delivered to him (with

the exception of Sunday issues which he returned Monday morning), whether his customers had paid him or not. From some of his customers he accepted, in lieu of money, farm produce, such as butter, eggs and firewood. Farmers remote from his route who wished to purchase the paper were rejected by him when he thought he could make no profit by delivering the paper to them. One or two of his customers were themselves dealers in the paper.

It is obvious that if Johnston accepted a pound of butter for papers which he had sold to a customer, the butter belonged to him, and the Journal had no claim upon it. If he accepted a dollar in payment of papers delivered, the money was his and he could not be prosecuted for embezzlement, regardless of what he may have done with the dollar. If a thief stole some papers from Johnston's car, Johnston, and not the Journal, was the victim of the theft. If, upon accepting a delivery of Journals, he destroyed them or gave them away, he could not be prosecuted for larceny by bailee. When those circumstances are features of a contract, it is normally interpreted as creating a vendor-vendee relationship, and not one of employer-employee.

The majority do not deny that Johnston was the owner by purchase from the Journal of the papers which he sold to his customers, but they say:

> "It cannot be denied that the sale of the plaintiff's papers to its carriers has very unusual features. Ordinarily, when a person becomes the owner of personal property by purchase he may do with it what he chooses. He may use it himself, sell it to another for whatever price he pleases, or, if he be so minded, destroy it. But Johnston had no such rights in the papers he purchased from the plaintiff. He was not merely limited in his right of resale with

respect to price and territory, as the automobile dealer may be, but *he was bound by contract to sell and deliver the papers promptly to a list of subscribers which was the property of the plaintiff and to repeat the process daily.* This, in our opinion, is the central meaning and purpose of the contracts. The circulation of a newspaper is its lifeblood; * * *."

Is there anything novel about the feature of the contract to which the majority attach great importance? Johnston, it must be remembered, was not a purchaser who bought for his own personal use. He was the type of retailer which is frequently identified as a distributor. Today many kinds of manufactured goods reach the ultimate consumer through distributors. Distributors and retailers own the goods which they vend. There are distributors of brushes, automobiles, electrical supplies, petroleum products, contractors' equipment, and so forth. None of them, regardless of whether or not it is so stated in their contracts, are at liberty to do as they please with the goods which they purchase from the manufacturer. Let us revert to the observation of the majority in which they say that an owner "may use it himself, sell it to another for whatever price he pleases, or, if he be so minded, destroy it." Mercantile practices have made vast strides since the test of ownership was defined by the words just quoted. Few retailers possess the privileges signified by the quoted expression. It is safe to say that no manufacturer of a well established line of goods would permit a dealer to destroy all products shipped to him, even if the dealer paid, month by month, for the goods he received. The reasons are obvious. Competitors would supply with their products the customers who previously had purchased from the product-destroying dis-

tributor. Good will would vanish and the manufacturer would soon lack a market for his product. The continued success of all manufacturers is dependent upon a repetition of sales to their customers. The statement made by the majority that "the circulation of a newspaper is its lifeblood" is, of course, true; but the distributor, whether he deals in mousetraps, automobiles or any other item, is equally the lifeblood of the industry. A glance at the display advertising placed over soda fountains which proclaims "the pause that refreshes" shows that the soda fountain is the lifeblood of a soft drink producer who sells his product for the same sum as The Journal, and which, like it, is dependent upon daily repeated sales.

Before going on, let us dispel all thought that the contract before us is a mere feat of legal engineering contrived to by-pass the Unemployment Compensation Act. Agreements between publisher and distributor, couched in words similar to those quoted above, are set forth in appellate court decisions announced long before social security legislation was thought of. It seems from the sums of money stated in decisions that contracts of the kind before us can acquire considerable value: *Buzby v. Buzby*, 13 Pa. Dist. 587; *Boehn v. Spreckels*, 183 Cal. 239, 191 P. 5; *State Compensation Insurance Fund v. Industrial Accident Commission*, 216 Cal. 351, 14 P. (2d) 306; and *Harlow v. Oregonian Publishing Co.*, 53 Or. 272, 100 P. 7. The authorities recognize that under contracts of this kind there is a property right in the business of selling and serving newspapers. Such contracts may be the subject of sale and assignment: 46 C. J., Newspapers, § 52, p. 35, and *Harlow v. Oregonian Publishing Co.*, supra.

Let us revert to the subject of the manufacturer's continued interest in his product after it leaves his premises. Regardless of what may have been the conditions when the law of sales first assumed form, today it is general practice for the producer to retain an interest in his product after it leaves his plant. The manufacturer wants to know the ultimate purchaser, his whims, his wishes and his experience with the product. He may prescribe the price at which the retailer shall sell the goods, restrict the distributor to a given territory or require him to take affirmative action for the development of good will for the product. It is a matter of every day observation that today's producer of goods retains an interest in his product after it leaves his plant, and that distributors are not permitted to deal with the product in any way that they please. See Williston on Contracts, Rev. Ed., § 1642.

When a person who wishes to market a product finds someone who is willing to help, there are several types of relationship which the law renders available to them; for instance, master and servant, employer and employee, owner and independent contractor. It may be, however, that they can so modify their methods that their relationship will not be affected by the *respondeat superior* doctrine. There are several of these other relationships, such as vendor and vendee, lessor and lessee, bailor and bailee. The law has no independent policy of its own which it imposes upon persons who contemplate entering into a relationship with each other. To the contrary, it leaves them free to choose any relationship they prefer. Freedom of choice is a right that ought to be preserved. The Unemployment Compensation Act does not undertake to limit that freedom.

When the Journal and Johnston met on July 1, 1938, for the purpose of entering into a contract, the employer-employee relationship was available to them if they wished to choose it. When two persons so situated enter into that relationship, the employee has no title to the papers which he sells to subscribers. Title remains in the publisher. The debt arising out of each sale is due to the publisher and all profits belong to him. Wages, or possibly a commission, become due from the publisher to the employee and if not paid present the latter with a cause of action against his employer. Fundamental to the employer-employee relationship is the doctrine of *qui facit per alium* which deems the master chargeable for anything which his servant did while acting within the scope of his authority. The servant is regarded as the alter ego of his principal.

Upon the other hand, if a publisher does not wish to have employees be the medium through which his paper reaches its readers, he may, if he wishes, select retailers or distributors. If he chooses retailers, the publisher wholesales his paper to them and they, in turn, sell copies to those who wish to buy. A retailer is, of course, not an agent of the person from whom he buys. He works for profits, not wages. He is the owner of the product which he offers to the custom. If he injures someone through the negligent operation of his car, he, and not the publisher, is responsible for the injury. Unlike an employee, who is generally a creditor of his principal, a retailer is generally a debtor to the producer.

Unless we are required to place upon the above-quoted contract some new or novel interpretation, its language plainly contemplates that between the Journal

and Johnston there should exist the vendor-vendee relationship. As already said, the contract bound Johnston to purchase at wholesale from the Journal a sufficient number of papers to take care of the custom along the route. After Johnston had made the purchase, he was the owner of the papers, and in turn became the vendor of each one he sold. The money paid to him for the papers belonged to him, as did likewise all accounts receivable arising out of the omission of vendees to pay at the time of delivery. In turn, Johnston, according to the plain words of the agreement, became debtor to the Journal for all papers delivered to him. It is evident that the contract contemplated that Johnston's reward would come in the form of profits, not wages or commissions. Since the car and the papers were his, anyone injured through his negligence had no right of action against the Journal: *Gall v. Detroit Journal Co.*, 191 Mich. 405, 158 N. W. 36, 19 A. L. R. 1164; *State Compensation Insurance Fund v. Industrial Accident Commission*, 216 Cal. 351, 14 P. (2d) 306; *Bohanon v. James McClatchy Publishing Co.*, 16 Cal. App. (2d) 188, 60 P. (2d) 510; and *Batt v. San Diego Sun Publishing Co.*, 21 Cal. App. (2d) 429, 69 P. (2d) 216. The provisions of the contract which bound Johnston to (1) deliver promptly the Journal to the custom along his route; (2) sell no other newspaper; (3) endeavor to promote the circulation of the Journal; (4) deliver to the Journal upon the termination of the agreement a list of all of his customers; and (5) charge for the paper "the established rate therefor", plainly were intended to stimulate the sale of the Journal and promote fair trade practices. Such provisions are frequently encountered in agreements whereby a manufacturer dis-

tributes his product through retail outlets. Provisions such as the fifth which fix retail price were once under the ban of the law, but now are deemed lawful.

Before determining whether the provisions of the Unemployment Compensation Act demand a holding that Johnston was an employee, let us determine whether, under commonly accepted legal principles, Johnston was an employee.

From Mechem on Agency, 2d ec., § 44, we quote:

"Agency is, further, to be distinguished from sale * * * 1. Is the party in question an agent to buy goods for the other or is he buying the goods on his own account and then himself selling them to that other? 2. Is the party in question an agent to sell goods for the other, or is he really buying the goods from that other to sell upon his own account?"

In § 48 the same eminent authority says:

"The essence of sale is the transfer of the title to the goods for a price paid or to be paid. Such a transfer puts the transferee, who has obtained the goods to sell again, in the attitude of one who is selling his own goods, and makes him liable to the person from whom he received them as a debtor for the *price* to be paid and not liable as an agent for the *proceeds* of the resale. The essence of agency to sell is the delivery of the goods to a person who is to sell them, not as his own property but as the property of the principal, who remains the owner of the goods and who therefore has the right to control the sale, to fix the price and terms, to recall the goods, and to demand and receive their *proceeds* when sold, less the agent's commission, but who has no right to a price for them before sale or unless sold by the agent."

In § 46 of his work on Sales, Professor Mechem states the fundamentals which determine whether a

distributorship contract which borrows from both the law of sales and the law of agency constitutes the distributor a retailer or an agent. The section says:

> "In construing these anomalous instruments, courts look chiefly at the essential nature and preponderating features of the whole instrument and not at the peculiar form of isolated parts of it. It matters very little what the parties have chosen to call their contract. Misfitting or misleading names may be very easily applied, but they cannot be permitted to conceal or change the legal nature of the instrument. If the parties have made a contract which really operates to transfer the title, it is a sale, * * *."

From 46 Am. Jur., Sales, § 18, p. 213, the following is taken:

> "One of the most material considerations in determining whether a particular transaction is a sale or a consignment for sale on account of the consignor seems to be whether there arises at the time of the consignment the relation of creditor and debtor between the consignor and consignee. If no liability arises, the transaction is usually regarded as a consignment for sale. On the other hand, if a liability to pay a fixed price for the goods or their reasonable value arises at the time of the consignment, the transaction is usually regarded as a sale, transferring the title to the consignee, and the fact that the consignee's liability to pay for the goods is postponed until or contingent on his reselling them does not prevent the transaction from being a sale."

From the carefully reasoned decision entitled *Mathews Conveyor Co. v. Palmer-Bee Co.*, 135 Fed. (2d) 73, I quote:

> "While the agreement that defendant was to devote its best efforts to the sale of plaintiff's

products may seem like an obligation of agency, there is no reason why a manufacturer may not require of all persons to whom it sells its goods, to do all that they lawfully can to make sales, to promote its interests. This does not necessarily show a relationship of agency; * * *. Whatever control may be said to have been exercised by plaintiff over defendant, is not here decisive on the issue of the agency. One may submit to a degree of control by another without being his agent; and one may control the conduct of another without being a principal, and without giving to the other authority to bind him. In this case, it can be said that plaintiff desired to sell its products in such a manner that its interests might be promoted, and required as part of the price in the making of the contract, that defendant, to whom it sold, should submit to certain restrictions."

In the much cited decision of *Piper v. Oakland Motor Co.,* 94 Vt. 211, 109 Atl. 911, the court said:

"Whether an agency does in fact exist in a given case depends upon the contract or arrangement under which the business is conducted, and it is entirely immaterial that the parties denominate the arrangement as an 'agency.' If one buys goods of another to sell on his account, it is a purchase, and not an agency, though called so by the parties."

Let us now take note of the provisions of the statute which Justice Lusk's opinion says demands a holding that the relationship between the Journal and Johnston was that of employer and employee. Before setting down the parts which his opinion quotes, I explain that the majority also cite parts of the statute which (1) define the meaning of the term "payroll"; (2) mention the elective features of the act; and (3) state the amount of benefits payable to unemployed. Those

parts are not cited by Justice Lusk for the purpose of showing that Johnston was an employee. It is the following provisions of the statute which he quotes for the purpose of showing that Johnston was an employee:

"(f) 'Employment' means service for an employer * * * performed for remuneration or under any contract of hire, written or oral, express or implied. * * *

"(E) Services performed by an individual for remuneration shall be deemed to be employment subject to this act unless and until it is shown to the satisfaction of the commission that:

"(1) Such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and

"(2) Such individual customarily is engaged in an independently established business of the same nature as that involved in the contract of service."

I believe that the above part which is preceded by the letter (E) was not intended to bring within the act someone who was omitted by the part preceded with the letter (f), but that its purpose is to prevent the exclusion from the act of independent contractors who do not have independently established businesses of their own.

Although I concede that the legislature could have expanded the above definition so that it would embrace the relationship which existed between the Journal and Johnston, I do not believe that it has done so. I think that it is better to give to the words above quoted their natural meaning and await a legislative amendment before holding that these parties are subject to

the act. I observe that after *Washington Recorder Publishing Co. v. Ernst,* 199 Wash. 176, 91 P. (2d) 718, 124 A. L. R. 667, had held that provisions similar to the above did not include a relationship which was virtually a counterpart to that created by the above contract, the legislature did not amend the Washington act so as to bring the relationship within it. To the contrary, it provided that "service as a newsboy selling or distributing newspapers on the street or from house to house" should not be deemed employment. 1939 Laws of Washington, Ch. 214, at p. 859; 1941 Laws of Washington, Ch. 253, at p. 922; and 1943 Laws of Washington, Ch. 127, at p. 341.

In the decisions which I shall shortly cite the courts held, under contracts substantially similar to the one before us, that a newspaper distributor was not an agent or employee of the publisher. It is true that this group of cases was not affected by unemployment compensation acts, but I shall quote the statutes which governed the decisions and it will be seen from the quoted language that the statute was equivalent substantially to the portion of our act upon which the majority depend. This group of decisions follows: *State Compensation Insurance Fund v. Industrial Accident Commission,* supra; *Batt v. San Diego Sun Publishing Co.,* supra; *Rathbun v. Payne,* 21 Cal. App. (2d) 49, 68 P. (2d) 291; *Bohanon v. James McClatchy Publishing Co.,* supra; *Hartford Accident & Indemnity Co. v. Industrial Accident Commission,* 123 Cal. App. 151, 10 P. (2d) 1035; *Associated Indemnity Corp. v. Industrial Accident Commission,* 115 Cal. App. 754, 2 P. (2d) 51; *New York Indemnity Co. v. Industrial Accident Commission,* 213 Cal. 43, 1 P. (2d) 12, 294 P. 707, 287 P. 368; *Birmingham Post v. Sturgeon,* 227 Ala. 162,

149 So. 74; *Philadelphia Record Co. v. Curtis-Martin Newspapers,* 305 Pa. 372, 157 Atl. 796; *Balinski v. Press Publishing Co.,* 118 Pa. Sup. 89, 179 Atl. 897; and *Creswell v. Publishing Co.,* 204 N. C. 380, 168 S. E. 408. See also *Buzby v. Buzby,* supra; *Call v. Detroit Journal Co.,* supra; and *Tyler v. Mcfadden Newspapers Corp.,* 107 Pa. Sup. 166.

The first of the decisions just cited was decided under the California Workmen's Compensation Act which defined the word "employee" as including "every person in the service of an employer * * * under any appointment or contract of hire or apprenticeship, express or implied, oral or written." I can discern no difference of any consequence between those words and " 'Employment' means service for an employer * * * performed for remuneration or under any contract of hire, written or oral, express or implied." (§126-702 (f), O. C. L. A.) The contract in that case was similar to the one before us. Throndson, the distributor, personally made the collections, but had the papers delivered by a boy named Mard. While performing his duties, Mard sustained an injury and, contending that Throndson was an employee of the Examiner, argued that therefore he (Mard) was also an employee of the publisher. The Commission agreed with him. In reversing its award, the court held that the contract created no relationship of employer and employee. It said:

"As we have seen from the facts stated above, the Examiner Printing Company did not pay Throndson any wages or compensation of any kind or nature. It sold outright to Throndson the papers which he circulated to the subscribers throughout his route. Throndson was not on the payroll of the Examiner Company. His profits came from the

sale of the papers * * *. We think it would be an unwarranted extension of this definition of an employee to hold that one who is not hired but who simply purchases papers or other commodities of another for the purpose of reselling them comes within the terms thereof."

In the Bohanon case, in which the contract covering an automobile route was similar to the one before us, the distributor, while delivering his papers by automobile, collided with a car driven by the plaintiff. The action was based upon a contention that the distributor was the publisher's agent and that, therefore, the publisher was liable for the injury. The statute defined the term "employee" as

"one who is employed to render personal service to his employer, otherwise than in the pursuit of an independent calling, and who in such service remains entirely under the control and direction of the latter who is called his master."

That statute, I submit, cannot be differentiated in any substantial detail from the one before us. In holding that the contract created no relationship of master and servant or of employer and employee, the court said:

"Primarily, the contract is one of purchase and sale whereby appellant agrees to sell and Engebrecht agrees to purchase an indefinite number of appellant's newspapers at a specified price per hundred. * * * It is therefore obvious that the final result which was expected to be achieved from the work of distribution which Engebrecht was to perform was the sale to him by appellant of the largest possible number of its newspapers."

In the Batt case the plaintiff's minor son was killed in the collision of an automobile in which he was riding with a car driven by a route carrier who was collecting

the price of papers previously delivered. The contract between the carrier and the publisher resembled the one before us. Based upon the authority of the Bohanon case, the court held that "young Cottrell was not the agent, servant or employee of appellant" and reversed a judgment which had been entered for the plaintiffs. The distributor in the Rathbun case, as in the case before us, was paid an automobile allowance. The facts and holding in that case are sufficiently indicated by the following headnote which precedes the decision:

> "Evidence disclosing that automobile driver was route carrier of defendant's newspaper, that defendant owned route and paid weekly amount to route carrier based on route mileage as partial compensation for gasoline used and upkeep of automobile, that carrier furnished his own automobile and purchased papers from defendant which he sold and delivered to customers of whom no record was kept by defendant, and that defendant procured insurance of blanket life policy for benefit of employees including carrier, *held* insufficient to permit recovery for injury caused by carrier's negligence, on ground that carrier was in defendant's employ."

The New York Indemnity case received unusually extensive consideration from the court. One Eustace, 34 years of age, was a newspaper vendor who sold papers upon a street corner. While so engaged he was struck by a passing car. He purchased his papers at a fixed price and sold them at a profit. All vendors were assigned to street corners by the publisher, who refused to continue supplying them with papers if their conduct or sales did not meet his standards. Eustace, alleging that he was an employee of the publisher within the purview of the California Work-

men's Compensation Act, claimed compensation for his injury. The California statute said:

"A servant is one who is employed to render personal service to his employer, otherwise than in the pursuit of an independent calling, and who in such service remains entirely under the control and direction of the latter who is called his master."

The California Workmen's Compensation Act said:

"The term 'employee' as used in section six to thirty-one, inclusive, of this act shall be construed to mean: Every person in the service of an employer as defined by section seven hereof under any appointment or contract of hire or apprenticeship, express or implied, oral or written."

The Commission sustained Eustace's claim and made an award. In 287 P. 368 the award was annulled. The decision held that the term "contract of hire" called for personal service; that the word "hire" implies that "a reward or compensation shall be paid for the services performed"; and that "the 'contract' contained no express stipulation that for the 'services' to be performed by the newsboy any reward or compensation as such would be paid to him." The decision which we just reviewed was by the California District Court of Appeals. From that court the case made its way to the California Supreme Court. In 294 P. 707 the court just mentioned reversed the District Court of Appeals and held that the evidence was sufficient to support the decision rendered by the Commission; that is, that Eustace was an employee of the publisher. It affirmed the award the Commission had made. Thereupon a petition for a rehearing was filed. Several *amici curiae* filed briefs. The decision rendered upon rehearing (213 Cal. 43, 1 P. (2d) 12) set aside the opinion reported in 294 P. 707, affirmed the decision

rendered by the District Court of Appeals (287 P. 368) and annulled the award made by the Commission. In taking that course, the court held that the facts did not "constitute such newsboys the employees of the publisher of said newspaper so as to entitle them to receive compensation at the hands of the industrial commission." It is evident that the court bestowed extensive consideration upon the very problem which is before us. It was aided by the briefs filed by amici curiae and had the added interest which came from the pronouncement of previous decisions printed in the Reports. Although the statutes which controlled the decision were not entitled the same as ours, nevertheless, their phraseology was the substantial equivalent of our statutes, and the social objectives of the statutes were not dissimilar to ours.

The Birmingham Post case was a proceeding under the Alabama Workmens Compensation Act by the administrator of the estate of one Sturgeon, deceased. The latter, while vending papers at a street corner, was killed by an automobile. The Alabama act provided:

> "The term 'employer' as used herein shall mean every person not excluded by 7543 who employs another to perform a service for hire and to whom the 'employer' directly pays wages. * * * The terms 'employee' and 'workman' are used interchangeably and have the same meaning throughout this chapter and shall be construed to mean the same. The terms 'wages' and 'weekly wages' and such expressions shall, in all cases, unless the context clearly indicates a different meaning, be construed to mean 'average weekly earnings.'"

That act, I am sure, cannot be distinguished in any substantial way from the terms of our Unemployment

Compensation Act upon which the majority depend. Sturgeon purchased his papers from the publisher and resold them at a price stated in the heading of the paper. At the end of the day he returned unsold copies. The court held:

"Measured by the rule of our decisions, we think the agreed facts disclose the relation of employer and employee did not exist between Sturgeon and the defendant but rather that of an independent contract."

It pointed out that Sturgeon worked for profits, not wages.

The above will suffice as a review of this group of cases. The decisions which we have not reviewed are in accord with the above.

In the present instance, when Johnston took into his possession papers which the Journal delivered to him as a result of his orders, he was their owner. Nothing remained to be done, after he had taken possession, to transfer title from the Journal to him. At that point he became debtor to the Journal for the wholesale price of the papers which he had in his hands. The fact that he had the privilege of returning surplus copies of the Sunday edition did not deny to the transaction the quality of a sale: 46 Am. Jur., Sales, §§480 to 486, and 55 C. J., Sales, § 592, page 585. At the end of the month the Journal mailed him a statement of account for all papers thus delivered in which he appeared as debtor and the Journal as creditor. Before the tenth of the month he paid the Journal the amount due. In order to have a profit for himself, it was necessary that the amount which he had received from his customers, plus the automobile allowance, exceed the total of the following expenses: (1) the sum due

the Journal for papers delivered to him; (2) the amount he spent for gasoline, oil, tires, repairs and parts; and (3) depreciation on his car. Thus, he was working for a profit, not wages.

The circumstances that, concurrently with the signing of the contract, a list of persons "who purchased The Journal" was "leased" to Johnston and he promised "to sell and regularly and promptly deliver The Journal to all said subscribers" is not out of harmony, I believe, with the vendor-vendee relationship. The prevailing opinion employs the terms "the contracts of subscription" and "subscription contracts already in existence before Johnston took over the route." I know of nothing which warrants the use of those terms. No witness, pleading or finding mentions any contracts of that kind. Although the contract between the Journal and Johnston employed the term "said subscribers", it seems clear that subscribers was used as a synonym for customers or buyers. I know of no contractual relationship between the persons upon the list and the Journal. Nothing was due from them to the publisher, as is evident from the fact that they paid Johnston for the papers delivered to them. They paid him with butter, eggs and firewood when they lacked money. The fact that they had no contract with the Journal is again indicated by the findings of the Commission, which state that the Journal sold its papers to the plaintiff—not to the customers—and that he, in turn, sold them to the people along the route. In fact, the findings, which I previously quoted, refer to the customers as "his subscribers"—not the Journal's. When Johnston began to sell papers to those persons they, obviously, became his customers. The people to whom he sold papers were no more subscribers to the

Journal than if they had purchased the paper at a newsstand or from a boy on the street. The requirement that, at the termination of the relationship, he was obliged to hand to the Journal a list of his customers would not have prevented him from selling to those same customers any other newspaper publication or product which he might then be vending. The facts in *In re Scatola*, 257 App. Div. 471, 14 N. Y. S. (2d) 55, 282 N. Y. 689, 26 N. E. (2d) 815, and *Salt Lake Tribune Publishing Co. v. Industrial Commission*, 99 Utah 259, 102 P. (2d) 307, from which the majority quote, are fundamentally different from those before us, as I shall later show.

Before engaging in further analysis and considering the decision of other courts which applied unemployment compensation acts to newspaper cases, let us see how the majority construe the excerpt of our act which they quoted, and which I have requoted. Although the prevailing opinion quoted that part of the act, it places major stress only upon the following portion of the act: " 'Employment' means service for an employer * * * performed for remuneration." In fact, a reading of the majority opinion inclines the mind strongly to the belief that the majority believe that only the words "service * * * performed for remuneration" are important. The segment of the act which they quoted leaves me wholly unsatisfied that a contract, which otherwise would create a vendor-vendee relationship, must now be construed as one which ushers in an employer-employee status. As we all know, the element, "service for an employer * * * performed for remuneration," is a part of the popular and also of the common law definition of employment. If that fragment is the tuning fork of the entire act,

then everything done, except through mercy, charity, affection or friendship, is an act of employment.

After the prevailing opinion makes the above-mentioned quotation, it neglects the words "employment" and "employer" which are in the quoted section of the act. The manner in which those words are lost sight of is indicated by the following excerpts taken from Justice Lusk's opinion:

"The meaning of service for remuneration, it is said, was not determined by our prior decisions, * * *. The word 'service' as counsel suggests, varies in meaning according to the context in which it is found, * * *. We agree with the statement in that case that the way 'service' is used in the Act 'indicates an intention on the part of the legislature to use the term in its broad general sense.' It is a broad term of description * * *. Whether the work done by Johnston was service for the plaintiff is a question that might well be considered settled on the authority of the Singer and Rahoutis cases, * * *."

Near the end of the decision the majority express their conclusions. It follows:

"We conclude that the plaintiff's contract with its carrier is a contract for the performance of service for remuneration. * * * In any event there is ample, substantial evidence to support the Commission's findings that Johnston performed services for remuneration for the plaintiff, * * *."

If the controlling language of the act is "service * * * for remuneration", then we have an extremely poor index to the law's meaning. A perusal of the Oxford dictionary will show that few words have ambits which exceed those of "service" and "remuneration". Everyone who earns his bread and butter,

regardless of how he does so, must render service or his remuneration will cease. *Creameries of America v. Industrial Commission*, 98 Utah 571, 102 P. (2d) 300, from which the majority quote, bestowed much attention upon the meaning of the word "service", but in the end left the meaning of the term as vague as before the decision was written. The majority frankly confess that the meaning of service is variable, and say: "* * * it would be impracticable, in our opinion, to attempt a definition by which to test every case that may arise." And yet they select that word as the cornerstone of the entire act. Referring to the word "service", they state: "It is a broad term of description * * *." Finally, they conclude: "The scope and limitation of the phrase 'service for remuneration' must at the last be determined by the traditional method of judicial inclusion and exclusion." I know of no such rule of statutory construction. The decision cited by Justice LUSK, *Noble State Bank v. Haskell*, 219 U. S. 104, 55 L. Ed. 112, 31 S. Ct. 186, 32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A 487, concerned the boundaries of the police power, and not the construction of a statute. It seems obvious that no court would embrace "the traditional method of inclusion and exclusion" if it knew of any test, rule, definition or formula which it could state. If this court cannot say what is included and what is excluded, how shall we be able to decide the next case? And how shall employers and employees know whether or not the act is applicable to them, if the best that we can say is that we will determine their cases by the inclusion and exclusion "method"? If the act itself suggests no rule, test, definition or formula by which anyone can know whether or not it is applicable, the authorities deem it

unconstitutional: Lewis' Sutherland Statutory Construction, 2d ed., § 86; *Menasha Woodenware Co. v. Coos Co.*, 66 Or. 431, 134 P. 1037; 50 Am. Jur., § 472, p. 484; and 59 C. J., § 161, p. 605. Surely we would not deem the act valid if it itself said that the method for determining its application to any person or industry should be "the traditional method of judicial inclusion and exclusion."

Of course, the act is not unconstitutional. The majority, I believe, created the necessity of resorting to the inclusion and exclusion process by ignoring words of the act which are even more important than the term "service for remuneration." The very sentence from which they selected that term includes the two significant words "employment" and "employer". Other parts of the act abound in such expressions as "employee", "employing unit", "wages", "payroll", "labor" and "employment office". Those terms and others of like kind indicate that the legislature was concerned with "service for remuneration" only when performed by an employee for an employer, and not with the service rendered to a customer by a retailer. Therefore, since Johnston delivered his papers as an incident to his business as a vendor of newspapers, the service to which the majority refer was not rendered by him as an employee.

Now let us consider some of the decisions which have been rendered under unemployment compensation acts. Neither *Rahoutis v. Unemployment Compensation Commission*, 171 Or. 93, 136 P. (2d) 426, nor *Singer Sewing Machine Co. v. State Unemployment Compensation Commission*, 167 Or. 142, 103 P. (2d) 708, 116 P. (2d) 744, 138 A. L. R. 1398, involved an individual who sold wares owned by himself and

who was seeking to make a profit. In each of those cases the person whom we held to be an employee was selling something which he did not own. In each he was working for a commission and in each he would have a direct cause of action against the person who, we held, was his employer, in the event the commission was not paid. In the Singer case Justice KELLY said:

"The machines sold were consigned to the agent and remained the property of the Company until sold. * * * He was also required to make collections on conditional sales contracts and delinquent accounts, on which actual collections he was paid a commission * * *. The agent was also required to care for, repossess and deliver to the Company any property the Company desired repossessed."

In the companion case of *Singer Sewing Machine Co. v. Industrial Commission*, 104 Utah 175, 134 P. (2d) 479, the court said:

"The business shows it was the Company goods, the Company's accounts; the Company's risks of profit and loss; the Company's money; the Company's customers; the Company's goodwill; the Company's salesman."

In the days when sewing machine agents traveled about in horse-drawn vehicles, long before any thought of social security had entered anyone's mind, the fact that the agent owned neither the machines which he vended nor the accounts which he collected caused the courts to hold that he was the agent of the manufacturer: *Singer Manufacturing Co. v. Rahn*, 132 U. S. 518, 10 S. Ct. 175, 33 L. Ed. 440.

Although, in our Singer case, the Company owned the machines which its representatives sold and the accounts which he collected, in the instant case the find-

ings state that Johnston owned the papers which he sold, and "where the claimant (Johnston) had sold newspapers to some subscribers who did not pay for the same, no deduction can properly be made from the amount of remuneration credited as wages, since the claimant was then the owner of an account receivable which was a property right existing in him." The distinction between this case and the Rahoutis and Singer cases is patent. It is the distinction between marketing newspapers through a retail distributor and selling something through an agent.

Decisions such as *Glielmi v. Netherland Dairy Co.*, 254 N. Y. 60, 171 N. E. 906, and *Creameries of America, Inc. v. Industrial Commission*, supra, are, I believe, of no value in our present inquiry. In them the court found that the contract did not truthfully delineate the relationship between the parties. Neither the parol evidence rule nor the Unemployment Compensation Act (§ 126-702 (f) (E) subd. (1)) confines court or Commission to a writing signed by an alleged employer and an alleged employee when either court or commission undertakes to determine the status of the parties. A writing may be a mere facade contrived for the purpose of giving a false impression concerning a relationship. For instance, in the Glielmi case, the dairy company denied that Glielmi was its employee. The court, in sustaining the Commission and in referring to the written agreement, said: "The contract is adroitly framed to suggest a different relation, * * * ." In the Creameries case the court found that the contract constituted "the dealer" (claimant) a mere puppet merchant. It pointed out that he was required to purchase a truck "which met the approval of the company"

and which "had to be painted in a certain manner and bear the company's name thereon." He

> "was required to keep his truck at the company garage, and repairs were made thereon by the company and charged to claimant without his knowledge or consent. Books of account were supposed to be kept by the claimant which books were required to be left at the offices of the company unless consent was obtained to take them home. The company maintained a special bank account for claimant, and deposited the money collected from customers. Claimant's check book, used to draw on said bank account, was required to be left at the office. The company had a right to inspect claimant's route and did so inspect it by maintaining a relief man who occasionally relieved claimant. This relief man, who was an employee of the company, made reports to the company on the condition of claimant's route. Some collections from customers on claimant's route were also made by a relief man who turned in to the company all sums so collected."

The difference between that set of facts and those before us is manifest. It will be recalled that, notwithstanding Johnston's efforts to show that he was required to do something beyond the contract's requirements, the Commission's findings say:

> "The district manager did not actually go beyond the insistence that the claimant fulfill the obligations of the written terms of his agreement."

Hence, in the present instance, as previously said, we ought to go no further than the provisions of the writing in determining the nature of the relationship between the contracting parties.

The prevailing opinion several times refers to *In re Scatola*, supra. It says that the contract in that case was "similar to that with which we are now deal-

ing." I cannot concur in that statement. The Scatola decision does not say whether or not a written agreement was in effect between Scatola and the newspaper publisher. It seems quite clear, however, that there was no writing. The Court of Appeals confined itself to the following decision: "Per curiam. Order affirmed without costs." Preceding that decision is a very brief statement of facts. Based upon what is said in *Claim of Eckler*, 261 App. Div. 313, 26 N. Y. S. 259, it seems that Scatola was a boy. The Appellate Division, from which Scatola's case made its way later to the Court of Appeals, rendered a decision which is only a little more than one page in length. According to it, "Scatola secured a position of route carrier by applying to an inspector * * *, who assigned him to a route upon which papers were to be delivered to about one hundred and twenty-five regular subscribers." Each day he was given the required number of papers and was charged for them. He collected from the subscribers twelve cents a week and, according to the decision, "the difference between that and the amount he paid was his compensation." Besides being supplied with one hundred and twenty-five papers for the subscribers, "He also received additional copies to be delivered to prospective subscribers. * * * The extra copies could not be sold to chance purchasers met upon the street. They were to be used in circularizing prospects." Scatola was paid a bonus for each new subscriber he obtained. If a subscriber quit or failed to pay, no deduction was made "until the readjustment," which occurred every three months. Scatola could be discharged at any time. According to the decision,

> "The relation between this carrier and publisher differs from that of a newsboy who purchases papers and sells them on the street corner through

crying his wares. While this carrier paid the appellant's inspector for the papers which he delivered, his ownership was qualified as they could be used only in fulfilling the publisher's contract with its subscribers and in furthering the effort of the publisher to obtain new subscribers.''

The following is the decision:

''In determining whether a person is an independent contractor or an employee, the authorities deem the right to 'hire' and 'fire' of great importance. The facts proven justify the finding made by the Board of Appeals that claimant was an employee within the meaning of the Unemployment Insurance Law * * * .''

Thus, through use of the familiar rule that the right to hire and fire is of great importance in determining whether or not one who renders service is an employee, the court affirmed the finding entered by the Commission. By reverting to the contract which the Journal and Johnston signed, it will be seen that Johnston could not be dismissed except ''for good and sufficient reason.'' It seems logical to infer that if Scatola had possessed a written contract containing a similar provision, the court would have announced a different decision.

Let us take notice not only for the distinction just mentioned, but of others. Johnston, unlike Scatola, was furnished with no free papers. Copies which he ordered for circularizing prospective customers were charged to him at the same price as other copies. He was paid nothing for obtaining new subscribers, unless remuneration is indicated by the following parts of the record. One of the Journal's representatives testified:

''There are those commissions granted to little merchants in towns and in Portland, as well as auto

route carriers, and to dealers in a town like Corvallis and the amounts may vary depending upon what type of contest they may have on or what would be going on at that particular time. There is no real set amount."

Johnston gave no testimony upon that subject. His contract, however, promised him nothing for obtaining new customers. He was asked, and answered, as follows:

"Q. Were you paid a commission?
"A. No."

He was also asked, and answered, as follows:

"Q. When you went to a new subscriber you got his subscription, did you make a report of that to the Journal Publishing Co.?
"A. Well, you have to send in an increase card for an increase in your daily papers.
"Q. Do you send them the name of the customer?
"A. No, just send in the increase card for the month and the length to be increased."

Since Johnston, when he got a new customer, did not send his name to the Journal, but merely ordered delivery to himself of a larger number of papers, it seems clear that the new customer was his, not the Journal's.

Although Scatola's account was readjusted when a subscriber failed to pay, nothing of that kind occurred when one of Johnston's customers neglected his account. It will be recalled that the Scatola decision speaks for "the publisher's contract with its subscribers." In the present case, it is clear that the Journal had no contract with anyone to whom Johnston sold a paper. Since Scatola received payment for

every new subscriber he secured, it seems likely that the new subscribers signed a subscription form, thereby creating a contractual relationship between them and the publisher. If that is so, we have a basis for the court's expression—"the publisher's contract with its subscribers." Since the publisher in that case had contracted with one hundred and twenty-five persons who lived in a given area to send his paper to them daily, it is clear that Scatola's status became that of an employee when he accepted the job of delivering the paper. Since the one hundred and twenty-five copies which were daily placed in Scatola's hands had already been sold to the subscribers, the act of putting them into his hands did not constitute him a vendee. The daily charge against him and his right to keep the collections were merely the methods selected for paying Scatola for his labor. Obviously, the court would have reached a different conclusion if (1) the customers had been Scatola's; (2) the publisher had had no contracts with the people on Scatola's route; (3) Scatola was required to pay for all papers, whether he sold them or not and whether his customers paid him or not; and (4) the contract was not terminable at will.

The majority say that the contract involved in *Salt Lake Tribune Publishing Co. v. Industrial Commission*, 99 Utah 259, 102 P. (2d) 307, was "similar to that with which we are now dealing." It may be that the contracts were similar, but, due to the fact that the publisher in the Salt Lake case went far beyond the contract, the resulting relationship was not similar to the one before us. In the Salt Lake case, the publisher, unlike the Journal, supplied the carriers with material useful in the prosecution of their work and issued to

them instructions from time to time. He communicated directly with the subscribers by sending them "house cards." The publisher's district managers supervised the boys closely and helped them to secure subscribers as well as collect their accounts. Every carrier was required to keep (1) a list of his customers; (2) a route card for each of them; and (3) a separate account for each. Subscribers, in lieu of paying the boys, could pay their accounts at the company's office or mail the money to that place. Whenever a carrier obtained a new customer the publisher mailed to that individual a subscription card. The subscription card, the house card and the fact that all subscribers could pay directly to the publisher established a contractual relationship between the publisher and the subscriber. Whenever a subscriber became delinquent the publisher sent him a letter urging payment of the overdue account. If the letter failed to produce payment, another went forth. If a carrier lost a customer and sought to reduce "his draw" so as to escape payment for the unwanted paper, his request was not allowed unless it was accompanied with return of the route card and "detailed reasons for the stop." The Commission found that the boy involved in the proceeding was an employee of the publisher. In sustaining the resulting award, the decision under review said: "The evidence further shows that the subscribers were the customers of the company rather than of the individual carriers." That observation was, of course, warranted by the fact that the publisher's district managers (1) helped to get the subscribers; (2) supervised the boys in their work: (3) helped in the collection of subscribers' accounts. It was also justified by the fact that the publisher (1) mailed to new subscribers a confirmation of their subscription; (2) through his own letters

urged delinquent subscribers to pay their accounts; and (3) subjected the carrier's request for reduction of his draw to the publisher's acquiescence. Those circumstances warranted the Commission in deeming the buyers subscribers to the paper and the boys, not as vendors, but as employees. In appraising the value of the paragraph from the Tribune decision which is quoted in the prevailing opinion, it must be borne in mind that that paragraph represented the views of only two members of the Utah court.

The attitude of the Utah court to a vendor-vendee case is shown in *Fuller Brush Co. v. Industrial Commission*, 99 Utah 97, 104 P. (2d) 201, 129 A. L. R. 511. In that case the company entered into written contracts with dealers resulting in the latters' purchase of the products of the plaintiff for resale to householders. The dealer obtained remuneration for his services through the difference in the sum which he obtained for the goods and that which he paid. Each dealer operated in a given territory and could sell for cash or grant credit. The majority of the court held that the resulting relationship was one of vendor and vendee, and that it was not within the Utah Compensation Act. The court said:

> "It covers only individuals who have been, or are in employment and who receive therefor wages as those two terms are defined in the act."

Even the dissenting opinion conceded that "true vendor-vendee or lessee-lessor relationships are not service relationships."

*Washington Recorder Publishing Co. v. Ernst*, 199 Wash. 176, 91 P. (2d) 718, 124 A. L. R. 667, was an action for a declaratory judgment as to the application

of the Washington Unemployment Compensation Act
to the status of newspaper carriers who were governed
by written contract. The latter was in all material
respects similar to the one before us, except (1) it sub-
jected the carrier to a greater degree of control; (2)
it required the carrier to have at call "a satisfactory
substitute"; (3) it could be cancelled at any time by
the publisher; (4) the carrier was required to deliver,
free of charge, advertising checking copies; (5) he was
required to settle his account with the publisher weekly;
and (6) he was confined to specific territory. The
court, after an extensive analysis of the employer-
employee and the owner-independent contractor rela-
tionships, held that the carriers were not employees.
In doing so it pointed out:

> "Under the contract between the publishing com-
> pany and its carriers for distribution of the Daily
> Olympian, the carriers purchase the paper from the
> publishing company at an agreed rate per week per
> paper and pay therefor weekly. The carriers sell
> the papers to their customers in the route or terri-
> tory designated and at the price stipulated in the
> contract. The money received from the sale of the
> papers by the carriers belongs to the carriers."

The Washington statute's definitions of "employ-
ment", "employer", "employee", and "wages" were
substantially the same as ours. The Washington Re-
corder decision has been criticized on the ground that
the court was overly influenced by common law stand-
ards. I observe, however, that in *Mulhausen v. Bates,*
9 Wash. (2d) 264, 114 P. (2d) 995, the same court which
wrote the Washington Recorder decision said concern-
ing it:

> "The basis for the decision in the publishing
> company case was that the relation of vendor and

purchaser existed between the publishing company and the paper carriers; that the carriers *bought and became the owners* of the commodity (newspapers) and sold it on their own account.''

The words in italics appear in that form in the court's decision. I submit that the decision is correct, and that it was based upon sound grounds. As I have already indicated, the Washington legislature, in the same year that the above decision was announced, expressly excepted from the meaning of ''employment'' ''services as a newsboy selling or distributing newspapers on the street or from house to house.''

I am satisfied that no relationship is within our Unemployment Compensation Act except the employer-employee relationship. Before an injury is justified as to whether a given person rendered service, it must first be established that that person was an employee. The ambit of ''service'' is more inclusive than that of the word ''employment''. I submit that unemployment compensation acts are based primarily upon the employment relationship. Service is a secondary element.

In 3 Law and Contemporary Problems 7, the writer says:

''Like workmen's compensation laws unemployment compensation laws operate upon an employer-employee relationship; * * *.''

In *Carmichail v. Southern Coal & Coke Co.*, 301 U. S. 495, 57 S. Ct. 868, 81 L. Ed. 1245, 109 A. L. R. 1327, the Chief Justice indicated that the basis of state unemployment compensation laws is ''those who employ labor in the processes of industrial production and distribution.''

In 16 Indiana Law Journal 469, the writer declares:

"The employment relation was chosen because, relatively better than any other group concept, it includes those sought to be protected. * * * They disclose that it was the Congressional purpose to extend the benefits of the act to the vast number of workers, primarily industrial, whose economic survival rests upon the continuance of an association with an entrepreneur assuring payment of wages as remuneration for services performed. * * *

"The employment relation, then, was chosen, apparently, not because it was considered the best possible criterion of coverage, but because it appeared the best practicable standard then available."

Johnston was entitled to no compensation unless he was an employee of the Journal during his base year. In determining whether or not he was an employee, the definitions recited in the act are controlling. By reverting to the definition quoted by the majority, and requoted in a previous paragraph of this opinion, it will be seen that all are within the act between whom there exists a relation of employer and employee. That term includes (1) principal and agent; (2) master and servant; and (3) owner and independent contractor—unless the latter possesses an independently established business of his own.

Section 2-216, O. C. L. A., says:

"In the construction of a statute or instrument, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted."

It is true that the act must be liberally construed, but the liberality is to be employed, not in determining

who are within the act, but in the administration of its beneficial features.

I know of nothing in the act which can justify a conclusion that a person who retails papers which he himself owns is an employee of the publisher from whom he bought the papers. Nor do I find any warrant in the statute for a conclusion that a publisher who sells papers to another upon the latter's orders, and bills him monthly for the total sales, is the employer of the buyer. Likewise, I find no support in the statute for a belief that profits earned by a person who resells a product at a price greater than cost, plus cost of operation, are wages.

For the above reasons, I dissent from the holding that Johnston was the employee of the Journal. It is my belief that he was a retail vendor of the papers published by the Journal.

I wish to dissent from still another conclusion announced in the prevailing opinion. The majority hold that Johnston's wages consisted of the total retail value of all the papers delivered to him by the Journal. No deduction whatever is made from that total. Some of the papers were never sold, but the prevailing opinion deducts nothing on that account. Some of his customers, Johnston swore, failed to pay their accounts. Nothing is deducted on account of that fact. Some of the customers gave Johnston farm produce in lieu of cash. The majority deal with those items as though they were cash. The total retail value of all the papers is deemed by the majority as Johnston's wages. Nothing is deducted on account of the expenses which Johnston incurred in handling the business. In the year and a half in which he dealt in The Journal, Johnston bought three used automobiles, several sets of

tires, as well as gasoline, oil, repair parts and automobile licenses. He swore that he confined the use of the cars almost exclusively to the delivery of The Journal and the collection of accounts. Each of the cars, with the exception of the last, was turned in upon the succeeding one as a part of the purchase price. Nothing is deducted on account of any of these heavy expenses. It will be recalled that the Journal credited Johnston monthly with an automobile allowance. When he accepted the additional task of handling some bundles of the Albany Democrat-Herald, together with a sack of mail, the allowance became $78 per month. The prevailing opinion quotes a finding of the defendant Commission which deemed the allowance ''in the nature of payment of rental for use of such vehicle, and not for services rendered.'' The finding continues:

"In the event the cost of operating the automobiles was either more or less than the allowance * * * such gain or loss was not in respect to wages for services performed since it was not predicated upon labor as service * * *."

The majority state that the findings just quoted ''are not justified by anything in the evidence.'' They continue:

"If an employer pays his employe more than he otherwise would because of expense that the employe incurs in rendering services, the amount so paid is part of the employe's remuneration for his services."

I cannot subscribe to that statement. I do not believe that allowances granted to a traveling salesman to defray his railroad fare and hotel bills are ''remuneration for his services.'' I think that the Commission was right when it deemed the automobile allowance

as a sum awarded to Johnston to help him take care of the expenses of his automobile. But if the majority are right in deeming the monthly award of $78 as "remuneration for his (Johnston's) services," then they ought to be consistent and add that amount to all the other sums with which they credit Johnston. The total would, of course, be ridiculous. In that manner Johnston's "wages" would appear to be well in excess of $100 a month, although the chances are that his dealings in the paper earned him no net profit whatever. Johnston kept no records of any kind. As a witness, he had no idea as to the number of gallons of gasoline which he had purchased nor of the sums which he paid for it. Having no records, he was unable to state accurately the amounts which he had paid for tires, parts and oil. In fact, he did not swear that he made a net profit in selling The Journal. It is doubtful, to say the least, whether he made a net profit in the year and a half in which he dealt in The Journal. Therefore, to grant him compensation is unwarranted.

For the above reasons, I dissent.